**In re A.J.S.;**

**The State of Ohio, Appellant.**

[Cite as *In re A.J.S.,* 173 Ohio App.3d 171, 2007-Ohio-3216.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 06AP–597.

Decided June 21, 2007.

Nigh & Zeidan, L.L.C., Tariq H. Zeidan, and Joseph A. Nigh, for appellee, A.J.S.

Ron O'Brien, Franklin County Prosecuting Attorney, and Zachary M. Swisher and Katherine J. Press, Assistant Prosecuting Attorneys, for appellant, the state of Ohio.

SADLER, Presiding Judge.

{¶ 1} Plaintiff-appellant, the state of Ohio, appeals the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, in which that court found that there was not probable cause to

believe that appellee, A.J.S., committed the offense of attempted murder, as charged in six counts of a criminal complaint filed against A.J.S., who was 16 years of age at the time of the events giving rise to the complaint. The court did, however, find probable cause as to two other counts charging A.J.S. with felonious assault arising out of the same incident.

{¶ 2} The following facts are gleaned from the record of the probable-cause hearing. At approximately 2:45 p.m. on March 22, 2006, A.J.S. entered the Body Language Productions tattoo shop in the city of Whitehall in Franklin County. Accompanying him were his friend Antwan Smith and his girlfriend, Markala Cooper. Also present in the shop were five employees, including Joseph Morgan and Michael Miracle.

{¶ 3} Morgan testified that A.J.S. and his friends started a disturbance and were asked to leave the shop, whereupon A.J.S. and Smith began making threatening statements to the shop's employees. Morgan testified that A.J.S. stated that the group "had heat" and were "gonna, peel our cap back," which Morgan construed as slang for an intention to shoot the shop employees. Morgan stated that as A.J.S. made these comments, he moved his hand in and out of his jacket as if he were reaching for something. At this point, Morgan directed another employee to call the Whitehall police.

{¶ 4} As the shop's employees escorted A.J.S. and his group toward the front door, and the group resisted, A.J.S. broke the shop's glass door. Morgan grabbed A.J.S. and told him, "You're not going anywhere. * * * You're gonna wait here till the cops get here. You just broke our window, you're gonna pay for that." Then Smith punched Morgan in the jaw, whereupon a physical scuffle ensued between the two. A.J.S.'s group left the store and ran toward the back of the building. The shop's employees followed them in order to record the license-plate number of their vehicle.

{¶ 5} The car was parked in a lot next to the lot for Body Language Productions. The car was running, and in its back seat sat A.J.S.'s friend Rochelle Farr. A.J.S. and his companions got into the car and began to pull away. When Miracle attempted to pry off the car's license plate, A.J.S., who was in the driver's seat, revved the engine while it was in neutral, then shifted into reverse. Miracle jumped out of the way, and he and Morgan each picked up a wooden stick or board and threw them at the car. At this point, A.J.S. began to pull away from the two men. Morgan and Miracle testified that they began to walk away at this point, believing the altercation to be at an end. Farr, on the other hand, testified that they and other shop employees continued to throw things at the vehicle. In any case, Miracle testified that nothing obstructed the vehicle from driving away.

{¶ 6} According to Farr, A.J.S. became angry and stopped and exited the vehicle. Miracle characterized it as a "sudden," "screeching" stop. Smith also exited the vehicle, and he and A.J.S. began to walk toward Miracle. Farr stated that A.J.S. then began shooting. From her vantage point in the back seat of the vehicle, she stated that A.J.S. was shooting toward the ground. Morgan testified that he heard the gun cock and, immediately thereafter, saw spray from water that had pooled on the surface of a grease trap located behind him in the parking lot.

{¶ 7} Morgan testified that he was standing five to seven feet from the car at the time he heard the first shot, and the grease trap was located about two feet from him. He stated that there was no more than 12 feet between A.J.S.'s car and the grease trap. The evidence indicated that the grease trap was three feet high. Morgan further testified that his co-workers, Jamie Hickey and Carey Bowen, were standing five to seven feet behind him and off to his side. Another co-worker, Dustin Hysell, was standing ten feet behind the grease trap. Morgan stated that Miracle was standing directly in front of him, between him and A.J.S.'s vehicle. When the vehicle stopped, Miracle saw Smith get out of the car and walk toward him yelling, "What then, nigga'." Miracle began to walk backwards away from the vehicle when the shooting began.

{¶ 8} Miracle began to run when he heard the first shot, and he counted a total of six shots. Miracle testified that one of the shots went through his pants leg, although he told the court that he had initially thought that the hole in his pants was caused when he fell on the pavement in his attempt to escape, but a police officer later informed him that a bullet had caused the hole. Smith was struck in the leg by one of the bullets. Farr testified that she viewed the wound and saw that the bullet entered Smith's leg at a point lower than the point at which it exited his leg. Whitehall Police Detective Steven Brown testified that he recovered six shell casings from the parking lot and one spent projectile from the inside of the grease trap. He also testified that he observed a bullet hole in the top of the grease trap.

{¶ 9} The state advances a single assignment of error on appeal, as follows:

The juvenile court abused its discretion when it failed to find probable cause on the charge of attempted murder.

{¶ 10} We must initially discuss the proper standard to be applied in reviewing a juvenile court's probable-cause determination in a mandatory bind-over. In their briefs and at oral argument, both parties argued that we should apply an abuse-of-discretion standard. In support of this proposition, A.J.S. cites in his brief cases that involve amenability determinations in *discretionary* bind-overs, proceedings in which trial courts are statutorily vested with discretion to

determine whether allegedly delinquent juveniles are amenable to rehabilitation in the juvenile justice system.

{¶ 11} The state takes a different tack and argues that the trial court abused its discretion in wholly refusing to consider certain circumstantial evidence of purpose to kill, such as the short distances between A.J.S. and the tattoo shop employees at the time that A.J.S. fired his weapon, the evidence that one bullet struck an object at a height of three feet, located just beyond the victims, and the fact that two other bullets struck Smith and Miracle.

{¶ 12} Because of the diversity of arguments and authorities directed to us by the parties, it is necessary to set forth in detail the authorities guiding the review in this case.

{¶ 13} Our standard of review is determined by whether the trial court's ruling upon the state's motion to relinquish jurisdiction required an exercise of discretion or a decision on a question of law. See *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896; see, also, *Ranson v. Sheridan* (Oct. 3, 1990), Hamilton App. No. C–890455, 1990 WL 143450. Though "a review of the evidence is more often than not vital to the resolution of a question of law[,] * * * the fact that a question of law involves a consideration of the facts or the evidence does not turn it into a question of fact. Nor does that consideration involve the court in weighing the evidence or passing upon its credibility." *O'Day* at 219, 58 O.O.2d 424, 280 N.E.2d 896.

{¶ 14} The Supreme Court of Ohio has explained:

Two types of transfer exist under Ohio's juvenile justice system: discretionary and mandatory. Discretionary transfer, as its name implies, allows judges the discretion to transfer or bind over to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system or appear to be a threat to public safety. See R.C. 2151.26(C) [now R.C. 2152.12(B) ].

Mandatory transfer removes discretion from judges in the transfer decision in certain situations.

*State v. Hanning* (2000), 89 Ohio St.3d 86, 90, 728 N.E.2d 1059.

{¶ 15} One such mandatory-transfer situation enumerated in the juvenile bindover statute, R.C. 2152.12, is when, as in the present case, the juvenile is 16 years of age at the time of the alleged offense and is alleged to have committed an act that if committed by an adult, would constitute attempted murder. R.C. 2152.12(A)(1)(a) provides:

After a complaint has been filed alleging that a child is a delinquent child for committing an act that would be * * * attempted murder if committed by an adult, the juvenile court at a hearing shall transfer the case if the child was

sixteen or seventeen years of age at the time of the act charged and there is probable cause to believe that the child committed the act charged.

{¶ 16} Congruently, Juv.R. 30 provides:

(A) *Preliminary hearing.* In any proceeding where the court considers the transfer of a case for criminal prosecution, the court shall hold a preliminary hearing to determine if there is probable cause to believe that the child committed the act alleged and that the act would be an offense if committed by an adult. The hearing may be upon motion of the court, the prosecuting attorney, or the child.

(B) *Mandatory transfer.* In any proceeding in which transfer of a case for criminal prosecution is required by statute upon a finding of probable cause, the order of transfer shall be entered upon a finding of probable cause.

{¶ 17} Ohio courts have consistently held that the preliminary hearing to determine the existence of probable cause is not adjudicatory, in that the juvenile's factual guilt or innocence is not at issue. See, e.g., *State v. Yoss* (1967), 10 Ohio App.2d 47, 48, 39 O.O.2d 81, 225 N.E.2d 275 ("The issue is one of jurisdiction * * * rather than one of a determination of guilt of a crime").[1]

{¶ 18} The Supreme Court of Ohio has held that precisely because a probable-cause finding does not involve factual adjudication of delinquency, such an order is not immediately appealable. *In re Becker* (1974), 39 Ohio St.2d 84, 68 O.O.2d 50, 314 N.E.2d 158. It has also been held that because there is no adjudication of factual guilt or innocence at the probable-cause hearing, jeopardy does not attach at that stage. See, e.g., *State v. Payne* (1997), 118 Ohio App.3d 699, 693 N.E.2d 1159; *In re A.M.* (2000), 139 Ohio App.3d 303, 308, 743 N.E.2d 937; *State v. Sims* (1977), 55 Ohio App.2d 285, 9 O.O.3d 417, 380 N.E.2d 1350, paragraphs one and two of the syllabus.

{¶ 19} In the case of *State v. Iacona* (2001), 93 Ohio St.3d 83, 752 N.E.2d 937, the Supreme Court of Ohio set forth the state's burden of proof and the manner in which the juvenile court must evaluate the evidence, in a mandatory-bindover case, to determine whether the state has met its burden of demonstrating probable cause. The *Iacona* court held, "[T]he state must provide credible evidence of every element of an offense to support a finding that probable cause exists to believe that the juvenile committed the offense before ordering manda-

---

1. See, also, *State v. Whisenant* (1998), 127 Ohio App.3d 75, 85, 711 N.E.2d 1016; *State v. Pruitt*, Trumbull App. No. 2001–T–0121, 2002-Ohio-7164, 2002 WL 32868031, ¶ 48; *In re A.M.* (2000), 139 Ohio App.3d 303, 308, 743 N.E.2d 937; *State v. Revels* (June 30, 1986), Butler App. No. CA 85–06–069, 1986 WL 7392.

tory waiver of juvenile court jurisdiction pursuant to R.C. 2151.26(B) [now renumbered as R.C. 2152.12(A) ].″ Id. at 93, 752 N.E.2d 937.

{¶ 20} The court went on to hold:

In meeting this standard the state must produce evidence that raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt.

Accordingly, in determining the existence of probable cause the juvenile court must evaluate the quality of the evidence presented by the state in support of probable cause as well as any evidence presented by the respondent that attacks probable cause.

Id. The state's evidence must be credible, but need not be unassailable. Id. at 96, 752 N.E.2d 937. "Determination of the merits of the competing prosecution and defense theories, both of which [are] credible, ultimately [is] a matter for a factfinder at trial." Id.

{¶ 21} The foregoing language from *Iacona* suggests that the juvenile court does not act as a factfinder at the preliminary hearing; rather, it evaluates the quality of the evidence and then decides whether the credible evidence adduced justifies a belief that the juvenile committed a particular offense. "In this context, probable cause is a reasonable ground or probability for belief that an act has been committed which, although requiring more than a mere suspicion, requires less than a prima facie showing." *Revels,* Butler App. No. CA 85–06–069, 1986 WL 7392, at *4.

{¶ 22} In performing this function, *Iacona* counsels, the juvenile court does not find facts, choosing one party's evidence over the other when the credible evidence is contradictory as to a fact or element of an offense. Instead, the juvenile court acts as a gatekeeper, charged with evaluating whether sufficient credible evidence exists to warrant going forward with a prosecution on a charge that the legislature has determined triggers a mandatory transfer of jurisdiction to adult court.

{¶ 23} In this way, the determination made at the probable-cause hearing is akin to a determination as to the existence of probable cause to search or stop in a suppression hearing, which the United States Supreme Court has described as follows:

The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "[T ]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."

(Emphasis added.) *Ornelas v. United States* (1996), 517 U.S. 690, 696–697, 116 S.Ct. 1657, 134 L.Ed.2d 911, quoting *Pullman–Standard v. Swint,* 456 U.S. 273, 289, 102 S.Ct. 1781, 72 L.Ed.2d 66, fn. 19.

{¶ 24} Thus, the juvenile court's decision as to the existence or nonexistence of probable cause is not a weighing of evidence and an exercise of discretionary fact-finding; rather, it is a decision whether the credible evidence adduced satisfies the statutory standard for the particular offense charged. An appellate court must defer to the trial court's credibility determinations, but the appellate court must determine de novo whether the juvenile court's conclusion of law (the conclusion that probable cause does or does not exist) was correct, given the credible evidence adduced. See *In re Cline,* Montgomery App. No. 19082, 2002-Ohio-3280, 2002 WL 1393600, ¶ 19.

{¶ 25} The Eighth Appellate District performed its review in this manner, relying on *Iacona,* in the case of *In re S.J.,* Cuyahoga App. No. 82106, 2005-Ohio-6353, 2005 WL 3215227. In *S.J.,* the juvenile was the subject of a delinquency complaint alleging that she committed an act that would constitute the crime of murder if committed by an adult. The complaint arose out of the fatal stabbing of another minor. The alleged delinquent was 17 years old at the time of the offense; thus, pursuant to R.C. 2152.12(A)(1), if the court determined that probable cause existed to believe that she committed the act alleged, then the court would have been required to relinquish jurisdiction to the court of common pleas.

{¶ 26} Following the preliminary hearing, the trial court ruled that the state had failed to establish probable cause for murder because it had not established probable cause to believe that the juvenile could have formed the requisite intent for that crime. The court of appeals stated that the issue before it was whether the state made "the necessary showing of probable cause that the juvenile committed the crime of murder—i.e. the purposeful killing of another?" Id. at ¶ 22. The court of appeals went on to state that in making this determination, it relied upon *Iacona*'s holding that the state must provide credible evidence of every element of an offense to support a finding of probable cause and that in meeting this standard, the state must produce evidence that raises more than a suspicion of guilt, but need not prove guilt beyond a reasonable doubt. *Iacona* also directs, the *S.J.* court noted, that the juvenile court evaluate the quality of the evidence of both parties and that the state's evidence must be credible, but need not be unassailable.

{¶ 27} The record in *S.J.* contained eyewitness testimony about the circumstances surrounding the altercation between the alleged delinquent and the victim that supported the belief that the killing was purposeful. On the other hand, the defense had presented testimony from a social worker and a psychologist that the

alleged delinquent was incapable of forming the requisite intent for the crime of murder because she had a low I.Q., was mildly retarded, had been sexually abused as a child, and suffered from posttraumatic stress disorder.

{¶ 28} The court of appeals recognized that "the defense did present some compelling evidence challenging the intent element of the crime of murder, [but] * * * such evidence is not sufficient to negate the state's showing of probable cause in this case." Id. at ¶ 30. The appellate court went on to quote *Iacona's* admonition that "[d]etermination of the merits of the competing prosecution and defense theories, both of which were credible, ultimately [is] a matter for a factfinder at trial." Id. at ¶ 31, quoting *Iacona* at 96, 752 N.E.2d 937. The court of appeals then determined, "[a]lthough the testimony presented by the defense may support the contention that appellee lacked the capability of a 'purposeful' killing, the fact that she took the affirmative action to take a knife outside to what she knew would be an altercation alone provides credible evidence to sufficiently compete on the question of whether she did act 'purposefully.' This case, in the end, should be decided by a fact finder at trial." Id.

{¶ 29} On that basis, the appellate court reversed. The court of appeals accepted the trial court's evaluation of the credibility of witnesses and the quality of the evidence, but independently considered whether the credible evidence presented at the preliminary hearing warranted a belief that the juvenile acted with the requisite mental state for murder.

{¶ 30} In the present case, we, too, must independently consider whether the credible evidence demonstrates probable cause to believe that appellant purposely engaged in conduct that if successful, would have caused the deaths of the alleged victims.

{¶ 31} Cited in the concurrence are the cases of *In re Stanley*, 165 Ohio App.3d 726, 2006-Ohio-1279, 848 N.E.2d 540, and *State v. Boddie* (Dec. 28, 2001), Montgomery App. No. 18709, 2001 WL 1657644, for the proposition that the proper standard of review of a juvenile court probable-cause determination is abuse of discretion. Post at ¶ 50. *Stanley* is inapplicable to the present case because in that case neither party assigned error in the trial court's probable-cause determination. In *Boddie*, the Second Appellate District applied an abuse-of-discretion standard to the review of a probable-cause determination. However, though that case was decided after *Iacona*, it contains no discussion of the standard set forth therein for the trial court's evaluation of the question of probable cause.

{¶ 32} As noted earlier, our standard of review is determined by whether the trial court exercised discretion or applied statutory standards to the evidence adduced. Because the trial court's probable-cause determination required the latter and did not involve discretionary fact finding, we must independently, and

without deference to the trial court, determine whether the credible evidence demonstrates probable cause to believe that appellant acted purposely.[2]

{¶ 33} Therefore, we must now decide the correctness of the trial court's determination that the state failed to meet its burden of demonstrating probable cause under R.C. 2152.12(A).

{¶ 34} A.J.S. was charged with committing an act that would be attempted murder if committed by an adult. The crime of murder, as relevant here, is set forth in R.C. 2903.02(A), which provides that "[n]o person shall purposely cause the death of another." The attempt statute provides that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A). Thus, in order to obtain a finding of probable cause and an order of transfer, the state was required to present credible evidence that A.J.S. purposely engaged in conduct that if successful, would have caused the death of another.

{¶ 35} The record reveals that Farr testified that she saw A.J.S. wield a gun and shoot it. She testified that she could not remember how many shots she heard, but when pressed by the trial court to recall how many she had heard "for sure," even though that "may not have been all that was shot," she stated that she recalled hearing at least three shots for sure. Miracle testified that he counted the shots and the number of shots that he heard was six. Accordingly, the state demonstrated probable cause to believe that A.J.S. fired six shots from a gun at the time and place in question.

{¶ 36} The remaining element of the charge is the culpable mental state of "purposely." The juvenile court made no findings in its judgment entry denying the state's motion to relinquish jurisdiction. However, review of the transcript of the probable-cause hearing provides insight into the reasons for the court's decision. The trial court was concerned with whether there was sufficient evidence of the requisite mental state for attempted murder. The court stated, "[T]here is no evidence I know of that says there [sic] was everyone at the time this happened, how close were they to one another." The court further stated, "[Y]ou're saying it's not possible for the—the bul—the shots to fired into the

---

2. Additional briefing was not ordered because both parties have thoroughly and adeptly explored the issue before this court; that is, whether the state met its burden of demonstrating probable cause as to the element of intent, which is clearly the element upon which the juvenile court found that the evidence was insufficient. Moreover, the parties do not dispute the admissibility or credibility of any piece of testimony; rather, they dispute whether the evidence, taken together, demonstrates probable cause to believe that A.J.S. harbored the mens rea required for the charged offenses. Additional briefing would not shed additional light on these issues, nor could counsel have more capably argued their respective positions, even under the standard of review employed herein.

ground. Well, it's the ca—it's the burden of the State to make that case if it's possible or not and * * * I don't see any evidence that would lead the Court to be able to agree that it was impossible he shot 'em all in the ground."

{¶ 37} The court went on to state:

I still am not clear who was where at what time; how far they were from one another. Why is it that all those folk, almost 12 people, some—some 11 some say testified they were 12, whatever, that no one could see the various—from various vantage points. But that again, is the burden of the state to establish all that. * * * [S]how me where everyone was and why you're saying it's impossible for the shots to all have been fired into the ground and why it's impossible for them have ricocheted * * *. So my question is, what evidence is the State relying upon to establish that there was any intention on the part of the alleged de—delinquent to support probable cause for aggravated [sic] murder[?]

{¶ 38} On appeal, the state argues that it presented credible evidence supporting a belief stronger than mere suspicion as to the element of a purposeful mental state. It directs our attention to the fact that A.J.S. made threatening statements and movements while still in the tattoo shop, referring to an intention to shoot the shop's employees, and to Farr's testimony that when A.J.S. exited the vehicle and brandished the gun, he was angry. Additionally, A.J.S. fired six shots from a weapon capable of inflicting fatal wounds toward numerous people located as little as seven feet and no more than 20 feet away from him. The state argues that this evidence establishes probable cause to believe that A.J.S. purposely attempted to cause the death of the six victims named in the complaint.

{¶ 39} In response, A.J.S. points to Farr's testimony that she saw A.J.S. aiming toward the ground. He further contends that the location of the damage to Miracle's pants corroborates Farr's testimony in this regard and demonstrates that he was not aiming at any ¡individual person. He also argues that the trajectory of the bullet that wounded Smith indicates that it ricocheted off the ground before striking Smith. A.J.S. argues that all of this demonstrates that he was indeed shooting at the ground and not at any person and thus lacked the requisite mental state of "purposely" sufficient for a charge of attempted murder.

{¶ 40} The state counters by pointing out that its evidence demonstrated that the first bullet fired after the gun was cocked struck the top of the grease trap located behind several of the alleged victims. Given that the grease trap was three feet high, the state argues, the evidence establishes probable cause to believe that A.J.S. was aiming for vital areas of the shop employees' bodies, thus evidencing a purposeful attempt to kill.

{¶ 41} "Purposely" is defined in R.C. 2901.22(A) as follows:

A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

{¶ 42} An intent to kill may be inferred "where the natural and probable consequence of a wrongful act is to produce death." *State v. Robinson* (1954), 161 Ohio St. 213, 53 O.O. 96, 118 N.E.2d 517, paragraph five of the syllabus. "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." *State v. Johnson* (1978), 56 Ohio St.2d 35, 39, 10 O.O.3d 78, 381 N.E.2d 637. "[A] firearm is an inherently dangerous instrumentality, the use of which is reasonably likely to produce death." *State v. Widner* (1982), 69 Ohio St.2d 267, 270, 23 O.O.3d 265, 431 N.E.2d 1025.

{¶ 43} Intent need not be proven by direct testimony. *State v. Burke* (1995), 73 Ohio St.3d 399, 404, 653 N.E.2d 242. Instead, an intent to kill may be deduced from the surrounding circumstances, including the nature of the instrument used, its tendency to end life if designed for that purpose, and the manner in which any wounds were inflicted. *State v. Eley* (1996), 77 Ohio St.3d 174, 180, 672 N.E.2d 640.

{¶ 44} The evidence in the record shows that A.J.S. pointed a gun toward a group of individuals who were located as little as five to seven feet and no more than 20 feet away and then fired six shots, with the first shot hitting the top of a grease trap, the height of which corresponds roughly with waist-height of the full-grown male victims. These acts, together with his words and gestures minutes before the shooting, strongly indicate that A.J.S. attempted to cause the death of these persons and did so purposely. *State v. Smith* (1993), 89 Ohio App.3d 497, 501, 624 N.E.2d 1114 (pointing a 9mm pistol at a group of people less than 20 feet away and firing at least one shot is strong evidence of an intention to kill such that conviction for murder was supported by sufficient evidence); *State v. Turner* (Dec. 30, 1997), Franklin App. No. 97APA05–709, 1997 WL 798770 ("The act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence"); *State v. Waddell* (Aug. 15, 2000), Franklin App. No. 99AP–1130, 2000 WL 1154289 (the act of reinitiating an argument, waving a gun in the air, and firing a shot between two individuals who are three feet away from the shooter is sufficient evidence of an intent to kill).

{¶ 45} The mere fact that the shots that wounded Smith and tore Miracle's pants hit nonvital areas of the body does not mean that a jury could not properly infer an intent to kill. *State v. Brust* (Mar. 28, 2000), Franklin App. No. 99AP–509, 2000 WL 311921. "The attempt statute * * * speaks to 'conduct that, if successful, would constitute or result in the offense.' There is no requirement

that the victim sustain any injury, let alone a potentially mortal wound, from the attempted act of murder." *State v. Talley* (Sept. 25, 1998), Lake App. No. 97–L–169, 1998 WL 684267, at *5. It is not a defense to a charge of attempted murder even if no harm results to a potential victim. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 220, 15 OBR 311, 473 N.E.2d 264.

{¶ 46} Although the evidence supports the conclusion that A.J.S. was merely trying to scare the tattoo shop employees by firing his gun, it also supports the conclusion that he acted purposely under the attempt and murder statutes. Under *Iacona*, then, it is for a fact-finder at trial to decide whether A.J.S. had no intent to kill and was shooting for some other reason (such as to scare the victims or to inflict non-life-threatening injuries), or whether he did act with an intent to kill and was simply a poor marksman. The evidence is sufficient to demonstrate more than a mere suspicion that he harbored a purpose to kill, and that is an adequate showing for probable cause. As the *Iacona* court instructed, the state must produce evidence that raises more than a mere suspicion of guilt, but need not provide unassailable evidence proving each element beyond a reasonable doubt.

{¶ 47} *Iacona* counsels that when, as here, both the prosecution and the defense present credible evidence at the probable-cause hearing showing that there was or was not probable cause as to each element of the charged offense, the state has satisfied the statutory requirements for mandatory bindover, and the juvenile court must relinquish jurisdiction to the court of common pleas for ultimate adjudication of guilt or innocence by a trier of fact. Therefore, the juvenile court in the present case erred in finding no probable cause and in refusing to relinquish jurisdiction.

{¶ 48} For this reason, the state's single assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is reversed, and, pursuant to App.R. 12(B), this cause is remanded to the juvenile court with instructions to enter appropriate findings and take other actions in accordance with this opinion.

Judgment reversed
and cause remanded.

BROWN, J., concurs in judgment only.

WHITESIDE, J., dissents.

WHITESIDE, J., retired, of the Tenth Appellate District, sitting by assignment.

BROWN, Judge, concurring in judgment only.

{¶ 49} In *State v. Iacona* (2001), 93 Ohio St.3d 83, 93, 752 N.E.2d 937, the Ohio Supreme Court set forth the standard for determining probable cause at a bindover hearing. Our court has cited *Iacona* in reviewing the case of *In re D.T.F.*, Franklin App. No. 05AP–03, 2005-Ohio-5245, 2005 WL 2403958, at ¶ 12, stating:

> In meeting this standard, the state must produce evidence that raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt. * * * The state must provide credible evidence of every element of an offense to support a finding that probable cause exists to believe that the child committed the offense. * * * To determine whether probable cause exists, the juvenile court "must evaluate the quality of the evidence presented by the state in support of probable cause as well as any evidence presented by the respondent that attacks probable cause."

*Iacona*, citing *Kent v. United States* (1966), 383 U.S. 541, 563, 86 S.Ct. 1045, 1058, 16 L.Ed.2d 84.

{¶ 50} The issue in *Iacona* was not whether the juvenile court erred in finding probable cause. The issue was, had a blood culture report been disclosed prior to the probable-cause hearing, whether the juvenile court would have reached a different conclusion regarding probable cause. Therefore, the *Iacona* court did not expressly set forth the proper standard of appellate review of a probable-cause determination. Rather, the juvenile court was directed to "evaluate the quality of the evidence." Id. I do not believe, in setting forth the standard for the trial court, that the *Iacona* court signaled a change in appellate review of probable cause in juvenile bindover proceedings, which is abuse of discretion. See, e.g., *In re Stanley*, 165 Ohio App.3d 726, 2006-Ohio-1279, 848 N.E.2d 540, at ¶ 18, 33 (using the abuse-of-discretion standard to review a trial court's decision pursuant to the mandatory-bindover provisions and its subsequent failure to apply the discretionary-bindover provisions); *State v. Boddie* (Dec. 28, 2001), Montgomery App. No. 18709, 2001 WL 1657644 (using the abuse-of-discretion standard to review a juvenile court's determination of probable cause in a mandatory-bindover hearing).

{¶ 51} Upon review of the present case, I concur in judgment only. Using the abuse-of-discretion standard, I would still find that the juvenile court erred in finding no probable cause as to attempted murder.

WHITESIDE, Judge, dissenting.

{¶ 52} Being unable to concur in the conclusions reached in the main or the concurring opinions, I must respectfully dissent.

{¶ 53} R.C. 2152.12 has been amended to require that a delinquent child who is 16 or 17 years of age, who is charged with committing an act that would be attempted murder if committed by an adult, must be transferred for trial as an adult provided that there is probable cause to believe that the child committed the act charged. Nevertheless, the proper standard of review in this case is abuse of discretion rather than purely a question of law for two reasons: (1) abuse of discretion is the only error alleged by appellant, the prosecution, for reversal of the trial court, and (2) it is the proper standard of review of a trial court determination of probable cause, assuming the prosecution has the right to appeal the trial court's probable-cause determination. Furthermore, the amendment to R.C. 2152.12 eliminated the discretion of the juvenile court to determine not to transfer the case when the juvenile was amenable to juvenile treatment.

{¶ 54} The single assignment of error raised by appellant is that "[t]he juvenile court abused its discretion when it failed to find probable cause on the charge of attempted murder." No other error is asserted by appellant. Second, abuse of discretion is the proper standard of review of a trial court determination that probable cause exists when such a question is properly appealable to an appellate court. This is true because the determination of probable cause is based upon the evidence adduced and certain factual findings necessarily made by the trial court as to whether the prosecution has shown probable cause that the accused has committed the offense with which he or she is charged. This determination requires a limited weighing of the evidence.

{¶ 55} When the standard of review is abuse of discretion, a reviewing court must accept the trial court's determination unless the trial court acts in an unreasonable, arbitrary, or unconscionable manner. See *State v. Finnerty* (1989), 45 Ohio St.3d 104, 543 N.E.2d 1233. In *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, the Ohio Supreme Court, quoting from *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144, stated: "The term 'abuse of discretion' ' * * * connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.' "

{¶ 56} In this case, there was no direct evidence as to defendant's intent, as is rarely the case, but there was evidence from which the trial court could have inferred that appellee had the requisite intent. However, whether to make an inference from the evidence is a question for determination by the trial court, not this court. There is also evidence before the trial court suggesting that appellee did not have the requisite intent, but instead was shooting into the ground in order to scare the alleged attackers, and the bullet that struck one of the attackers could have ricocheted. In light of the totality of the evidence, I am unable to find that the trial court's attitude was unreasonable, arbitrary, or

unconscionable.  Because there was an evidentiary basis for the trial court's determination, even though there also is an evidentiary basis for the determination that the appellant seeks, this court is not permitted to substitute its judgment for that of the trial court since the standard of review is abuse of discretion.  Accordingly, being unable to find an abuse of discretion on the part of the trial court, I would overrule appellant's assignment of error and affirm the judgment of the trial court from which this appeal is taken.