[Cite as *State v. Plymale*, 2016-Ohio-3340.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
GALLIA COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | | Case No. 15CA1 |
| Plaintiff-Appellee, | : | |
| | | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| | | |
| JOSEPH D. PLYMALE, | : | |
| | | |
| Defendant-Appellant. | : | **RELEASED: 6/3/2016** |

_____

APPEARANCES:

Timothy Young, Ohio State Public Defender, and Nikki Trautman Baszynski, Assistant State Public Defender, Columbus, Ohio, for appellant.

C. Jeffrey Adkins, Gallia County Prosecuting Attorney, Eric R. Mulford & Britt T. Wiseman, Gallia County Assistant Prosecuting Attorneys, Gallipolis, Ohio, for appellee.

_____

Harsha, J.

{¶1} After a jury convicted Joseph D. Plymale of seven crimes, he filed this appeal. First, Plymale argues that the aggravated murder, aggravated robbery, and related verdicts were against the manifest weight of the evidence because they were primarily supported by the self-serving and unreliable testimony of one witness, Christopher Bowman. But credibility generally is an issue for the trier of fact. Here the state introduced testimony of investigators and co-workers, DNA evidence, and surveillance video, all which corroborated Bowman's testimony, as well as evidence that Plymale lied to police. Based on this evidence the jury properly found the essential elements of the crimes proven beyond a reasonable doubt. Because the jury did not clearly lose its way or create a manifest miscarriage of justice, we reject Plymale's first assignment of error.

{¶2}  Plymale also contends that his trial counsel provided ineffective assistance by failing to file a notice of alibi and by failing to object to the state's comments on his post-arrest silence. Plymale's counsel told the trial court that he did not file a notice of alibi because he did not believe that the witness's testimony would provide a clear alibi defense. In his explanation to the trial court Plymale's counsel did not state when he learned of the potential alibi witness or whether he could have filed a timely notice of alibi, if he had determined it was appropriate to do so. Because the record contains no evidence that Plymale's counsel knew of the potential defense in time to file a notice of alibi as required under Crim.R. 12.1, we reject this argument. And the state was entitled to question him about prior inconsistent statements he made to investigators after he waived his *Miranda* rights. Therefore, his trial counsel's failure to object on Fifth Amendment grounds would have been futile and was not deficient. We overrule Plymale's second assignment of error.

{¶3}  Finally, Plymale asserts that the trial court erred when it sentenced him to consecutive sentences because the trial court did not make the statutorily required findings before imposing consecutive sentences. Because Plymale did not object to the imposition of consecutive sentences at the sentencing hearing, he waived all but plain error, which he has not established. He also contends that the trial court's justifications for imposing consecutive sentences are not supported by the record. However the record is replete with evidence to support the trial court's findings. Thus we overrule Plymale's third assignment of error.

{¶4}  We affirm the judgment of the trial court.

I. FACTS

{¶5}  When a neighbor found John Sheets's abandoned white pickup truck along the side of a road and called 911, the Gallia County Sheriff's Office responded to the call. After speaking with the neighbor, a deputy sheriff went next door to Sheets's residence and found Sheets's body inside. A grand jury ultimately indicted Plymale with aggravated murder, murder, aggravated robbery, having weapons while under disability, theft of firearms, theft of a motor vehicle, receiving stolen property, and tampering with evidence.

{¶6}  At trial the state presented the testimony of Sheets's neighbor, Tammy Korn, who said that she heard a gunshot on the afternoon of Monday, February 3, 2014 and later that day she saw Sheets's garage door open and his white pickup truck gone.  Korn attempted unsuccessfully to contact Sheets by telephone over the next several days. On Wednesday Korn and another neighbor, John Troyer, found Sheets's abandoned truck on Dan Jones Road. Korn returned home and called 911.  Troyer testified that he saw Sheets's truck speeding away from Sheets's house on the same afternoon that Korn heard the gunshot, but he was unable to see the driver.

{¶7}  Deputy Sheriff Brown responded to Korn's 911 call and located Sheets's abandoned truck.  Brown went to Sheets's home and found Sheets's body and evidence of an altercation, but no evidence of a forced entry.  The medical evidence showed that Sheets suffered a fatal gunshot wound, which punctured his right lung from the back and exited through his chest.  They found an open gun safe that appeared to be missing guns, blood splatter marks inside the home, a bloody boot print on the carpet, and a pillowcase missing from a pillow in Sheets's bedroom.

{¶8} Video surveillance taken from a park on Dan Jones Road at 3:45 pm on Monday, February 3, 2014 near Sheets's abandoned truck showed his white pickup truck pulled up next to a green Jeep, which was later determined to belong to Bowman. That same day video surveillance from a convenience store showed that at about 4:30 pm, a green Jeep was at the intersection of State Routes 554 and 160, near Plymale's apartment complex. Neither of the two surveillance videos showed the drivers of the vehicles.

{¶9} After investigators determined that the green Jeep belonged to Christopher Bowman, they brought him in for questioning on Friday, February 7, 2014, to determine what he might know about the identity of the driver of Sheets's truck. The jury reviewed the videotape of Bowman's questioning. On that videotape Bowman initially lied to the investigators but then, when the investigators told Bowman that his green Jeep and a white pickup truck were seen together on surveillance video, Bowman told investigators what had happened on Monday afternoon, February 3rd. He was very reluctant to identify the driver of the white pickup truck, claiming that the person was close to him and like a brother. Bowman finally identified the driver of the pickup truck as his cousin Joseph Plymale. Bowman said that Plymale had asked him to drive him out to his boss's house because Plymale's car was inoperable and he needed to speak to his boss. Bowman agreed and drove as Plymale directed. Plymale asked Bowman to drop him off down the road from his boss's house because Plymale said that he was afraid Bowman's Jeep would get stuck in the snow. Plymale told Bowman he would call him to get him when he was ready. Bowman drove around the area, taking photos of frozen waterfalls, while waiting for Plymale. At some point,

Bowman stopped and approached a county worker who Bowman believed was stuck in the snow and asked him if he needed help.

{¶10} Bowman drove to a park and was waiting when a white pickup truck approached with Plymale driving. Bowman stated that he was concerned when he saw Plymale driving a truck that did not belong to him. The two briefly drove around, with Plymale in the truck and Bowman in the Jeep, before stopping on Dan Jones Road. When they stopped Plymale showed Bowman a large number of guns in the cab of the truck and asked Bowman to help him load them into Bowman's Jeep. Bowman asked Plymale what was going on, but Plymale told him he didn't want to know. Plymale abandoned the truck on the road and rode with Bowman back to Plymale's apartment where the two unloaded the guns into Plymale's storage unit. Bowman told the investigators that Plymale gave him $1000 in cash and two guns to keep quiet about everything.

{¶11} Bowman told investigators that he believed Plymale had stolen the guns but he did not know to whom the guns or the white pickup truck belonged. He said that only after he learned of Sheets's murder on the news the previous day, did he surmise that Plymale had robbed and murdered Sheets. Bowman stated that he knew that Plymale's estranged wife, Sarita, was John Sheets's daughter. Bowman stated he did not know John Sheets personally, and did not know what he looked like or where he lived.

{¶12} Bowman told investigators that they could find the two guns that Plymale gave Bowman under the bed in his guest bedroom. He also told them that only $200 was left of the $1000 and they could find that in his wallet in his home. He also

admitted to possessing two separate quantities of heroin and told investigators where in his house they could find the heroin. Bowman and his wife consented to a voluntary search of their home and investigators found everything Bowman mentioned, where he said they would.

{¶13} On Friday, February 7, 2014 after interviewing Bowman, investigators set up surveillance at Plymale's apartment and storage unit.  They caught Plymale selling a rifle to a co-worker.

{¶14} The investigators advised Plymale of his *Miranda* rights, but he signed a waiver of those rights and answered questions.  Investigator Michael Trout testified that he questioned Plymale about the murder of John Sheets and the guns that were found in Plymale's storage unit. Plymale told Trout that he did not know much about the murder and that a person named Clinton Shelton gave him the guns. Plymale stated that he was helping Shelton sell the guns.  After investigators finished questioning Plymale, they placed him under arrest.

{¶15} A search of Plymale's apartment and storage unit uncovered additional firearms belonging to John Sheets, a blanket and pillow case belonging to Sheets, Plymale's work boots with treads that matched the bloody boot imprint on Sheets's carpet, a note Plymale wrote that stated that he "went out walking to the farm to get the rent $" and "then going to have Chris get me and drive me to Jamie's + Cody's then be home  * * *," and a receipt showing Plymale's rent was paid on February 3, 2014.

{¶16} Forensic evidence showed that DNA on the pillow case matched Sheets and Plymale, but excluded Bowman.  Plymale's DNA was also located on the passenger side of Bowman's Jeep.

{¶17} The jury watched Bowman's videotaped statements of February 7, 2014 and heard Bowman testify, which was generally consistent with the statements he gave to investigators a year earlier. Bowman positively identified the photos taken from surveillance videos from February 3, 2014 as his green Jeep and the white pickup truck Plymale drove. Bowman testified that he was currently in a residential drug rehabilitation program in Columbus and had stopped using heroin.

{¶18} Plymale's counsel asked Bowman about his past heroin use and played the videotaped interview between the investigators and Bowman, pointing out several inconsistencies in some of the details between Bowman's testimony at trial and the statement he gave a year earlier to the investigators. Bowman explained the discrepancies by acknowledging that a year had passed since Sheets's murder and his statements to the investigators were made closer to the time when the offenses occurred. Plymale's counsel also asked Bowman whether as part of his plea agreement, Bowman had agreed to testify at Plymale's trial and Bowman acknowledged that he had. Bowman testified that in exchange for a guilty plea to two felonies – complicity to theft and receiving stolen property – he was sentenced to four years of community control, required to participate in a drug treatment program, and required to testify truthfully against Plymale. Bowman's agreement stipulated that for purposes of determining whether his testimony was truthful, his videotaped statements to the investigators were true, accurate and complete.

{¶19} Other evidence presented at trial included the testimony of the apartment manager where Plymale lived. The apartment manager testified that Plymale approached him in the beginning of February, either on February 2 or 3, 2014 and

asked to rent a storage unit at the apartment complex and the manager leased one to him. Several of Plymale's former co-workers testified that Plymale offered to sell firearms to them beginning February 4, 2014.

{¶20} Plymale testified in his own defense at trial. However, his testimony at trial was entirely inconsistent with the statements he gave to the investigators a year earlier. Instead of claiming that the guns were from a person named Shelton, he testified that he received the guns from Bowman. He stated that Bowman came to his house at about 1:30 or 2:00 pm, borrowed his cell phone and drove off without giving any explanation. After Bowman left, Plymale claims his sister, Burgandy Plymale, stopped by at about 2:30 or 3:00 pm, dropped off cigarettes, and visited "for a little bit." He testified that his sister lived in the same apartment complex and typically stopped by his house daily to check in and see if he needed anything. After she left he stayed in his apartment watching movies. Plymale claims Bowman showed back up at his house at about 5:00 pm with seven or eight guns, again without any explanation, and asked Plymale if he would help Bowman unload, store, and sell the guns and Plymale agreed. Plymale said that after he and Bowman unloaded the guns into the storage unit, they used heroin together in Plymale's apartment.

{¶21} Plymale also testified that he is married to Sarita Sheets, the victim's daughter but that he and Sarita were no longer living together. Plymale testified that he had visited his father-in-law's home about eight times and was aware that Sheets had a large number of guns. Plymale also presented letters of encouragement John Sheets wrote to Plymale when Plymale was in prison; Sheets invited Plymale to visit him when he was released from prison.

{¶22} After the jury returned a guilty verdict on aggravated murder, murder, aggravated robbery, having weapons under disability, theft of a motor vehicle, theft of firearms, and tampering with evidence, the trial court sentenced Plymale.[1] The trial court merged the aggravated murder with the two murder counts and the aggravated robbery with the two theft counts. The court sentenced Plymale to life in prison without possibility of parole for aggravated murder, three years for the gun specification, 11 years for aggravated robbery, 36 months for having weapons under disability, and 36 months for tampering with evidence, all sentences to be served consecutively.

## II. ASSIGNMENTS OF ERROR

{¶23} Plymale raises three assignments of error:

1.     THE AGGRAVATED-MURDER, AGGRAVATED-ROBBERY, AND RELATED VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. OHIO CONSTITUTION, ARTICLE IV, SECTION 3(B)(3); TR. 471-472, 474, 533, 535-536, 539-540, 624-626, 627, 643, 892, 994, 1000, 1009.

2.     TRIAL COUNSEL WAS INEFFECTIVE. FIFTH AND SIXTH AMENDMENTS TO THE U.S. CONSTITUTION; OHIO CONSTITUTION, ARTICLE I, SECTION 10; *STRICKLAND V. WASHINGTON*, 466 U.S. 668, 104 S.CT. 2052, 80 L.ED.2D 674 (1984); *DOYLE V. OHIO*, 426 U.S. 610, 96 S.CT. 2240, 49 L.ED.2D 91 (1976); CRIM.R. 12.1; CRIM.R. 52; TRIAL TR. 187-188, 771-773, 774, 875-877, 900-901, 915, 924-925, 933-934, 941, 980, 1008, 1017.

3.     THE TRIAL COURT ERRED WHEN IT SENTENCED MR. PLYMALE TO CONSECUTIVE SENTENCES. *STATE V. BONNELL*, 140 OHIO ST.3D 209, 2014-OHIO-3177, 16N.E.23D 659; R.C. 2929.14; TR. 1073.

## III. LAW AND ANALYSIS

### A.  Manifest Weight of the Evidence

#### 1.  Standard of Review and Law

---

[1] The prosecution entered a nolle prosequi on receiving stolen property and two other untried counts.

{¶24} Plymale claims that his convictions are against the manifest weight of the evidence. When considering whether a conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *State v. Hunter*, 131 Ohio St.3d 67, 2011–Ohio–6524, 960 N.E.2d 955, ¶ 119. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541(1997). However, we must also bear in mind that credibility generally is an issue for the trier of fact. *State v. McKnight*, 107 Ohio St.3d 101, 2005–Ohio–6046, 837 N.E .2d 315, ¶ 191; *State v. Linkous*, 4th Dist. Scioto No. 12CA3517, 2013–Ohio–5853, ¶ 70. Accordingly we may reverse the conviction only if it appears that, when resolving the conflicts in evidence, the factfinder " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins at* 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). We exercise our discretionary power to grant a new trial " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175. Conversely, we will not reverse a conviction if the state presented substantial evidence upon which the trier of fact could reasonably conclude that all essential elements of the offense had been established beyond a reasonable doubt. *State v. Colbert*, 4th Dist. Jackson No. 05CA3, 2005-Ohio-4427, ¶ 9 citing *State v. Eley*, 56 Ohio St.2d 169, 383 N.E.2d 132 (1978), syllabus.

{¶25} The state argues that in a manifest weight of the evidence challenge, the appellate court must construe the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. However, *Jenks* was describing "[a]n appellate court's function when reviewing the *sufficiency of the evidence* to support a criminal conviction" – not a manifest weight of the evidence review. (Emphasis added.)

{¶26} The distinction between a review of the sufficiency of the evidence and the weight of the evidence was explained in *Thompkins, supra,* and again in *Hunter*:

> A claim of insufficient evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the verdict as a matter of law. In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts."

> A claim that a verdict is against the manifest weight of the evidence involves a different test. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' "

(Citations omitted.) *State v. Hunter,* 131 Ohio St.3d 67, 84, 2011-Ohio-6524, 960 N.E.2d 955, 974, ¶¶ 118-120; *see also State v. Colbert*, 2005-Ohio-4427 at ¶8-9 (discussing both standards of review). Thus, as the "thirteenth juror" we do not view the evidence in a light favorable to the prosecution, but independently weigh it, giving deference to the

jury on credibility issues. Where there is conflicting evidence – such as two witnesses giving two very different versions of events – our task is to determine if the jury, in resolving those conflicts, clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

## 2. Analysis

{¶27} Plymale argues that the jury clearly lost it way when it decided to believe the testimony of the state's witness, Christopher Bowman, and disbelieve Plymale's own version of events. Plymale claims the case came down to the credibility of these two witnesses and that no reasonable factfinder could have believed Bowman over him. He argues that Bowman's testimony was self-serving, unreliable, and conflicting and that Bowman received a plea deal in exchange for his testimony.

{¶28} In reviewing the entire record, including the videotaped questioning of Bowman four days after the murder, we find that the jury did not "lose its way" in resolving the conflict between Bowman's and Plymale's version of events. First, Bowman's testimony was not self-serving. Bowman voluntarily agreed to waive his *Miranda* rights and answer questions without the benefit of an attorney present. The only people present were Bowman and two investigators – his statements were not the result of a negotiated deal between his attorney and the prosecutor. Bowman received no promises from the investigators that he would have a "deal' with the prosecutor in exchange for truthful statements to them. At most the investigators told Bowman that it would be better for him to tell the truth and that they would tell the prosecutor how cooperative Bowman had been. This point is reinforced towards the end of the questioning when the investigator says, "I'll be honest, you know you helped in the

commission of a crime. It will be up to the prosecutor and what the prosecutor wants to do.  It's your level of cooperation, which is like what I said to you in the beginning that helps your situation."  Bowman's statements implicated him in a murder, robbery, and receiving stolen property. His consent to the search of his home so police could locate the guns and money, led to his further admission that he possessed heroin.  In reviewing the entirety of the videotape of Bowman's questioning, we find no aspect of it self-serving.

{¶29} Second, Bowman's statements were reliable. Bowman told the investigator that while he was out in the area that afternoon he had stopped to help a county worker who he thought was stuck in the snow. In the video viewed by the jurors, the investigator acknowledged that he had spoken to the county worker, who confirmed that event as Bowman described it. The investigators found the two handguns, money and heroin where Bowman said they would be. Bowman's description of Plymale's use of a pillow case to transport some of the guns and the fact that they were unloaded in Plymale's storage unit proved to be accurate. Bowman's version of the events was supported by extrinsic, objective evidence, including photographs from the surveillance video; forensic evidence of Plymale's DNA on the pillow case used to transport the guns from Sheets's house to the storage unit. Plymale's relationship to Sheets as his son-in-law, Plymale's knowledge of Sheets's gun collection, and Sheets's welcoming and supportive relationship with Plymale, as evidenced by the letters of encouragement Sheets sent to Plymale when Plymale was in prison, explained why there was no evidence of forced entry into Sheets's home.

{¶30} Third, Bowman's statements during questioning were generally consistent with his trial testimony; the discrepancies in certain details were credibly explained by the passage of time.

{¶31} In contrast the version of events Plymale told to the investigators – that he got the guns from a guy named Shelton – was vastly different from his trial testimony. A jury could have reasonably determined that Plymale was not credible and that his story at trial was not plausible. Plymale did not have an explanation for why Bowman and some unknown third party would execute a murderous plan to steal guns without Plymale's involvement, and then suddenly and unexpectedly show up at Plymale's storage unit, which coincidentally Plymale had just rented within the past two days.

{¶32} In determining the rational persuasiveness of two competing versions of the events, the jury could have reasonably concluded that Bowman was credible and his testimony truthful. Based on the evidence the jury properly found the essential elements of the crimes proven beyond a reasonable doubt. We cannot say that the jury clearly lost its way. We reject Plymale's first assignment of error.

B. Ineffective Assistance of Counsel

{¶33} Plymale argues that his trial counsel provided constitutionally ineffective assistance when he: (1) failed to file a notice of alibi and (2) failed to object to the state's comments on his post-arrest silence.

1. Standard of Review and Law

{¶34} To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a

reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *State v. Short*, 129 Ohio St.3d 360, 2011–Ohio–3641, 952 N.E.2d 1121, ¶ 113; *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Knauff*, 4th Dist. Adams No. 13CA976, 2014–Ohio–308, ¶ 23. Because this issue cannot be presented at trial, we conduct the initial review.

**{¶35}** The defendant has the burden of proof because in Ohio, a properly licensed attorney is presumed competent. *State v. Gondor*, 112 Ohio St.3d 377, 2006–Ohio–6679, 860 N.E.2d 77, ¶ 62. Failure to satisfy either part of the test is fatal to the claim. *Strickland* at 697; *State v. Bradley*, 42 Ohio St.3d 136, 143, 538 N.E.2d 373 (1989). In reviewing the claim of ineffective assistance of counsel we must indulge in "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689.

## 2. Failure to File Notice of Alibi

**{¶36}** Plymale claims that his attorney provided ineffective counsel because he did not file a notice of alibi as required by Crim.R. 12.1. Plymale argues that in the opening statement, his counsel told the jury what Plymale did during the day on February 3, 2014 and that part of the events of the day involved Plymale's sister, Burgandy Plymale. Counsel stated that after Bowman came by, Burgandy Plymale stopped by Plymale's apartment, got cash from Plymale for cigarettes, walked down to the convenience store, purchased cigarettes, and came back to Plymale's apartment around 3:00 pm and stayed and watched movies with them and then eventually left.

Plymale argues that as a result of counsel's oversight, the exclusion of his sister's testimony was prejudicial because it prevented him from presenting corroborating testimony to support his alibi testimony and bolster his credibility.

{¶37} The state points out that Crim.R. 12.1 provides that where a defendant proposes to offer alibi testimony, a notice of alibi must be filed *seven* days prior to trial. Here, Plymale's counsel did not disclose Burgandy Plymale as a witness until *five* days before trial. Therefore, Plymale's argument requires this Court to conclude that counsel knew of alibi testimony in time to file a timely notice even though the record fails to demonstrate this.

{¶38} In *State v. Few*, 2nd Dist. Montgomery No. 25161, 2012-Ohio-5407, trial counsel had filed a notice of alibi the day after trial started and had given a copy to the state the day before it started. In rejecting defendant's ineffective assistance of counsel claim for failure to file a timely notice of alibi, the appellate court found that while the notice was deficient, "there is nothing in the record to reflect that trial counsel was made aware of Few's claimed alibi seven days prior to the date of the trial." *Id.* at ¶ 15. Therefore the court concluded that the record did not demonstrate that trial counsel was deficient for failing to comply with Crim.R. 12.1. *See also State v. Alexander*, 6th Dist. Erie No. E-91-86, 1993 WL 313564, *10 (Aug. 6, 1993) (rejecting an ineffective assistance of counsel claim where there was nothing in the record to show that trial counsel knew of the alibi seven days prior to trial).

{¶39} Here there is no evidence in the record that Plymale's counsel knew of a potential alibi in time to file a timely notice. Plymale's counsel told the trial court why he did not file a notice of alibi:  he did not believe that the witness's testimony would

provide a clear alibi defense because evidence of Sheets's time of death was uncertain. In his explanation Plymale's counsel did not state when he learned of the potential alibi witness, or whether he could have filed a timely notice of alibi, if he had determined it was appropriate to do so. The record shows that he did not file a supplemental list of witnesses until January 28, 2015 – five days before trial. There is nothing in the record to indicate when counsel learned that Burgandy Plymale may have relevant alibi testimony. Without this evidence we would have to speculate about whether trial counsel's failure to file a notice of alibi was based on his lack of knowledge of it, the product of an informed and calculated trial-strategy decision, or negligence. *See State v. Smith*, 17 Ohio St.3d 98, 101, 477 N.E.2d 1128, 1131 (1985) (finding that counsel's noncompliance with the notice of alibi requirement in Crim.R. 12.1 "was an intended, self-serving trial tactic"). We cannot conclude that trial counsel's performance was deficient based upon speculation. Plymale cannot prevail in a direct appeal on a claim of ineffective assistance of counsel based on evidence that is outside the record. *See State v. Hampton*, 4th Dist. Lawrence No. 15CA1, 2015-Ohio-4171, ¶ 28

3. Failure to Object to State's Questioning on Post-Arrest Silence

**{¶40}** Plymale argues that his counsel was ineffective for failing to object to the state's repeated comments on his post-arrest silence. He claims that the state's comments on his silence for impeachment purposes violated his constitutional rights and his counsel's silence exacerbated this error. The state argues that Plymale waived his *Miranda* rights and gave inconsistent testimony. Thus, the state's questioning was for impeachment, contrasting Plymale's two drastically different stories.

{¶41} The Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." *State v. Leach*, 102 Ohio St.3d 135, 2004–Ohio–2147, 807 N.E.2d 335, ¶ 11. The Fifth Amendment guarantees a criminal defendant's right against self-incrimination, which includes the right to silence during police interrogation. Additionally, a defendant can invoke his rights at any time prior to or during questioning. *State v. Harper*, 4th Dist. Vinton No. 11CA684, 2012–Ohio–4527, ¶ 14.

{¶42} The record shows that after the police caught Plymale selling firearms on Friday, February 7, 2014, investigator Michael Trout questioned him. Plymale signed a written waiver of his *Miranda* rights and answered Trout's questions. The record does not contain any other references to police questioning of Plymale and we can find no instances in which Plymale asserted his *Miranda* rights. During the interview when Trout questioned him, Plymale said that he obtained the firearms from an individual named Clinton Shelton. However, Plymale waived his Fifth Amendment right again and testified in his defense at trial, telling a completely different story, claiming he received the firearms from Bowman.

{¶43} The state's questioning focused on whether Plymale had previously told Trout any part of the drastically different trial testimony. Plymale answered that he had not told Trout any of those facts during the interview, except for the fact that he was trying to sell guns to Cody Hockman:

> Q. When you were arrested you did lie to Mike Trout according to your testimony today, about Clint Shelton giving you the guns?
>
> A. Yes sir.

 *   *    *

Q. But you lied to both Justin Rice and Mike Trout according to your testimony today?

A.  Yes sir.

Q. The police who were investigating this incident?

A. Yes sir.

Q. Did you ever tell Mike Trout about Chris Bowman?

A. No.

Q. Did you ever tell Mike Trout that Chris Bowman asked to borrow one of your cell phones?

A. No sir.

Q. Did you ever tell Mike Trout that you rented this storage unit from Noah Stevens?

A. No sir.

Q. Did you ever tell Mike Trout that the keys that were in your pocket when you were arrested went to the storage unit lock?

A. No sir.

Q. Did you ever tell Mike Trout that there were guns in that storage unit?

A. No sir.

Q. Did you ever tell Mike Trout about trying to sell a gun to Cody Hockman?

A. No sir. Sorry Eric, I did.

Q. Okay.

A. Yeah.

Q. On that one you did?

A. Yeah, yes sir, I did.

Q. And from February the 7th of 2014 when you were arrested until today have you ever told this story about Chris Bowman to any law enforcement officer investigation the murder of John Sheets.

A. No sir.

**{¶44}** On redirect, Plymale testified that he was only questioned by police once and that was on the evening of February 7, 2014. The reason he did not mention Bowman was because he was not specifically asked about him:

> Q. Joey, Mr. Mulford just asked you a whole string of questions about whether you told MikeTrout a whole list of things and you answered no to all of them except one. Did MikeTrout ask you any of those questions?
>
> A. No sir.
>
> Q. He asked if you've told this story to law enforcement officers since February 7, 2014, have you been questioned by any law enforcement officers over that time?
>
> A. No sir.

**{¶45}** The state's questioning, Plymale's answers, and defense counsel's redirect focused on Plymale's two inconsistent versions of events, both made after waiving his *Miranda* and Fifth Amendment rights. The questioning shows that, although Plymale had the opportunity during Trout's questioning to tell his "Bowman" version of events, he never told it to Trout or the other investigators.

**{¶46}** If Plymale had asserted his *Miranda* rights in response to a second attempt by police to question him, the state's last question could possibly be construed as improperly referencing this. However, there is no evidence in the record that Plymale ever asserted his *Miranda* rights. In the context, the last question emphasized Plymale's inconsistency: Over a year later, for the first time at trial and never during Trout's questioning, Plymale is telling a vastly different story. Thus we find that the state did not violate Plymale's Fifth Amendment rights because the state's questioning did not improperly use Plymale's silence as substantive evidence of guilt. Instead the state used his lack of silence – his two inconsistent stories – to impeach his credibility and discredit his trial testimony. As a result, trial counsel's objection on Fifth

Amendment grounds would have been futile. It was not deficient and his decision on redirect to frame it as a lack of police diligence was trial strategy.

**{¶47}** For the same reasons we reject Plymale's argument that during closing argument the state improperly referenced his silence to infer his guilt. Like the cross-examination questioning, the state's comments during closing argument emphasized Plymale's inconsistent testimony and the fact that the version Plymale told at trial was not told to investigators a year earlier when Trout questioned him.

**{¶48}** Because Plymale has not established a viable claim of ineffective assistance of his trial counsel, we overrule his second assignment of error.

### C.  Imposition of Consecutive Sentences

**{¶49}** Plymale argues that the trial court erred when it sentenced him to consecutive sentences because it did not make the necessary finding of proportionality under R.C. 2929.14(C)(4). Additionally, he argues that even if the trial court did make such a finding, it is unsupported by the record.

### 1.  Standard of Review and Law

**{¶50}** When reviewing felony sentences, we apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016–Ohio–1002, ___N.E.3d ___, ¶ 22. Under R.C. 2953.08(G)(2), an appellate court may increase, reduce or modify a sentence or may vacate the sentence and remand the matter to the sentencing court if it clearly and convincingly finds either:

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶51} Under the tripartite procedure set forth in R.C. 2929.14(C)(4) for imposing consecutive sentences, the trial court had to find that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) that one of three circumstances specified in the statute applies. *See generally State v. Baker*, 4th Dist. Athens No. 13CA18, 2014–Ohio–1967, ¶ 35–36. The trial court is required to make these findings at the sentencing hearing and to incorporate its findings in its sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014–Ohio–3177, 16 N.E.3d 659, syllabus. "The trial court need not use talismanic words to comply with R.C. 2929.14(C)(4), but it must be clear from the record that the trial court actually made the required findings." *State v. Campbell*, 4th Dist. Adams No. 13CA969, 2014-Ohio-3860, ¶ 25.

{¶52} Plymale failed to object to the imposition of consecutive sentences at the sentencing hearing and forfeited this issue, absent plain error. *Hunter*, 131 Ohio St.3d 67, 89, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 152 (2011). Plain error exists when the error is plain or obvious and when the error affects substantial rights. To rise to the level of plain error, it must appear on the face of the record that an error occurred. *State v. Slagle*, 65 Ohio St.3d 597, 605, 605 N.E.2d 916 (1992) ("The appellate court must examine the error asserted by the defendant-appellant in light of all of the evidence").

{¶53} The test for plain error is a stringent one. A party claiming plain error must show that (1) an error occurred, (2) the error was obvious, and (3) the error affected the outcome of the proceeding. The burden of demonstrating plain error is on the party asserting it. *State v. Davis*, 116 Ohio St.3d 404, 2008–Ohio–2, 880 N.E.2d 21, ¶ 378 (where nothing in the record supported a finding of plain error, appellant failed to meet his burden). An error affects substantial rights when, but for the error, the outcome of the proceeding clearly would have been otherwise. We take notice of plain error with the utmost of caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Merryman*, 4th Dist. Athens No. 12A28, 2013-Ohio-4810, ¶ 49.

## 2. Analysis

{¶54} The trial court made the required findings at the sentencing hearing and incorporated those findings in its sentencing entry. At the sentencing hearing the trial court expressly stated that it has considered the principles and purposes of sentencing and all the evidence and arguments presented during the five-day trial. The court stated that the longest prison terms were appropriate because Plymale committed the worst form of aggravated murder and aggravated robbery given the circumstances of the crimes. He was welcomed into the victim's home, shot the victim in the back, robbed him, and fled in the victim's own truck. The court specifically found "that consecutive sentences are necessary to protect the public and punish the offender," "are not disproportionate," and "the harm was so great or unusual that a single term does not adequately reflect the seriousness of the conduct."

{¶55} The record shows that the trial court considered all three factors set forth in R.C. 2929.14(C)(4) in imposing consecutive sentences. The sentencing entry reads:

> The Court finds that consecutive sentences are necessary to protect the public and punish the Defendant, are not disproportionate and the harm caused was so great or unusual that a single term does not adequately reflect the seriousness of the Defendant's conduct.

{¶56} The trial court almost recited word-for-word the statutory findings in R.C. 2929.14(C)(4) both at the hearing and in its entry. However, when it made its finding that consecutive sentences are not disproportionate, it dropped the phrase "to the seriousness of the offender's conduct and to the danger the offender poses to the public" that exists in the statute. Under *Bonnell, supra*, "a word-for-word recitation of the language of the statute is not required, as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29.

{¶57} For example, in *Bonnell*, the trial court did not refer to or recite any portion of the language in R.C. 2929.14(C)(4) at the sentencing hearing. Nevertheless, the Supreme Court of Ohio found that the finding that Bonnell had "shown very little respect for society and the rules of society" was the equivalent to the first part of subsection (C)(4) and showed that the trial court "found a need to protect the public from future crime and to punish Bonnell." *Id.* at ¶ 33. And the trial court's reference to Bonnell's "'atrocious'" record was the equivalent to a finding under subsection (C)(4)(c) and showed that the trial court found that "a history of criminal conduct that demonstrated the need for consecutive sentences to protect the public from future crime." *Id.* However, the Court could find no word or phrase from which it could

conclude that the trial court addressed the proportionality factor in the second part of

subsection (C)(4): "We cannot glean from the record that the trial court found

consecutive sentences were not disproportionate to the seriousness of the offender's

conduct and to the danger the offender poses to the public." *Id.* at 36.  The Court

vacated the sentence and remanded it to the trial court for resentencing.

{¶58} Here we do not have to conduct a *Bonnell*-style comparison of words and

phrases with subsection (C)(4) to determine if the trial court made the appropriate

findings because the trial court gave an almost verbatim recitation of the section. We

find *State v. Greene*, 8th Dist. Cuyahoga No. 100542, 2014-Ohio-3713 instructive.

There, the trial court imposed consecutive sentences and the defendant appealed

arguing that the trial court had not made the required findings under R.C.

2929.14(C)(4). The transcript at the sentencing hearing showed that the trial court

stated:

> I'll note, for the record, pursuant to 2929.14(B)[sic](4), that this Court believes that the maximum term should be imposed, but the consecutive terms imposed are necessary to protect the public, to punish the offender. And it is not a disproportionate sentence.

*Greene* at ¶ 6 (alteration in original).

{¶59} The appellate court found that the trial court had satisfied all the

requirements of R.C. 2929.14(C)(4):

> The court satisfied the first prong of the analysis when it found that the public needed to be protected from Greene and that consecutive terms were being imposed to punish her. Regarding the second part of the analysis, *although barely addressed, the court noted that a consecutive sentence is not disproportionate to Greene's conduct.*[1] Lastly, the court noted that Greene was under community control sanctions for her attempted felonious assault conviction at the time she was convicted of obstruction of justice and involuntary manslaughter. (Emphasis added.)

*Greene* at ¶6 – 7.  In its footnote the appellate court recognized that the trial court did not state the disproportionality test in its entirety but recitation of these "magic words" was not needed:

> Although the court did not specifically state that the sentence is not disproportionate to the *seriousness* of Greene's conduct *and the danger she poses to the public*, to reverse and remand in this case would be tantamount to merely requiring the "magic" words. (Emphasis sic).

*Greene* at fn. 1; *see also State v. Gray,* 8th Dist. Cuyahoga No. 98970, 2014-Ohio-4668 (no "proportionality" language was used by trial court, but appellate court found proportionality findings were made by the language referencing the "number of caskets" defendant was filling and his endangerment of the "innocent little toddler and the 86-year old gentleman walking with a walker").

{¶60} Plymale argues that although the trial court found the sentence to be "not disproportionate," this was insufficient because the court did not identify what the sentence was not disproportionate to.  He argues the trial court should have stated that the sentence imposed was not disproportionate "to the seriousness of the offense or danger posed to the public."  Without this additional language clarifying the trial court's proportionality analysis, Plymale insists that we must presume the court erred and balanced the wrong factors. However, neither Plymale nor the record indicates what incorrect factors the court might have used. The plain error analysis requires that Plymale show an actual obvious error – not one that possibly may have occurred.

{¶61} Plymale cites two cases in support of his argument that the phrase "not disproportionate" is insufficient to satisfy the requirements of the statute. However, both cases are factually distinguishable. In *State v. Dennison*, 10th Dist. Franklin No. 14AP-

486, 2015-Ohio-1135, the appellate court found that trial court engaged in the incorrect analysis of proportionality when it compared the sentence of the defendant to those of co-defendants that had pleaded guilty and found that the defendant's sentence was not disproportionate to that of co-defendants.  As a result, it was clear from the record that the trial court had engaged in the wrong analysis; i.e. consistency rather than proportionality. Here, Plymale cites to nothing in the record that supports his argument that the trial court's analysis was similarly flawed or that any other obvious error occurred.

{¶62} Likewise, in *State v. Collins*, 4th Dist. Pickaway No. 13CA27, 2014-Ohio-4224, we found nothing in the record that would show that the trial court considered the proportionality factor when it imposed consecutive sentences. Here, the trial court expressly stated that it had considered the proportionality factor.

{¶63} The trial court expressly stated that it considered the need to protect the public and the seriousness of the offenses when it imposed its sentence and specifically identified all three of the factors listed in the statute. In finding that consecutive sentences "are not disproportionate," the court showed that it was considering the proportionality factor. There is no need to quote the statute when the record shows that the court considered both the statutory factors in imposing its sentence. "[A] word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell*, 140 Ohio St. 3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29; *Campbell*, 4th Dist. Adams No. 13CA969, 2014-

Ohio-3860, ¶ 25 ("The trial court need not use talismanic words to comply with R.C. 2929.14(C)(4)"); *State v. Gray*, 8th Dist. Cuyahoga No. 98970, 2014-Ohio-4668; *State v. Greene,* 8th Dist. No. 100542, 2014-Ohio-3713.

**{¶64}** Finally, we reject Plymale's argument that consecutive sentences were unwarranted. He claims that a mandatory prison term of life imprisonment without parole is sufficient to accomplish the purposes of felony sentencing without imposing consecutive sentences. Courts have upheld the imposition of consecutive sentences that include a life sentence as long as the court makes the required findings. *See, e.g., State v. Roark*, 3d Dist. Mercer No. 10-14-11, 2015-Ohio-3811, ¶ 24 (affirming the imposition of two consecutive life sentences without the possibility of parole for a home invasion and murder).

**{¶65}** The record contains evidence to support the trial court's findings. The victim was Plymale's father-in-law, who had supported him with encouraging letters during Plymale's previous prison term. The victim welcomed Plymale in his home. Nevertheless, Plymale shot and killed the victim while his back was turned, stole a number of firearms, and fled in the victim's truck. Plymale's motive: To steal his father-in-law's valuable gun collection and turn it into cash for himself. Given the senseless nature of the crime and Plymale's relationship with the victim, the record supports the trial court's findings and conclusion that consecutive sentences were appropriate.

**{¶66}** We overrule the third assignment of error.

### III. CONCLUSION

**{¶67}** Having overruled Plymale's assignments of error, we affirm his convictions and sentence.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Gallia County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily cotinued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & McFarland, J.:  Concur in Judgment and Opinion.


For the Court


BY: _____
       William H. Harsha, Judge


### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**