[Cite as *State v. Hughley*, 2020-Ohio-1277.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,              :

                               No. 108518

    v.                               :

TREVON HUGHLEY,                         :

    Defendant-Appellant.             :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED
**RELEASED AND JOURNALIZED:**  April 2, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-630643-A

---

## *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John F. Hirschauer, Assistant Prosecuting Attorney, *for appellee.*

Office of the Ohio Public Defender, and Lauren Hammersmith, Assistant State Public Defender, *for appellant.*

MARY J. BOYLE, P.J.:

**{¶ 1}** Defendant-appellant, Trevon Hughley, appeals the juvenile court's decision to bind him over to adult court. He raises two assignments of error for our review:

> 1. The juvenile court violated [Hughley's] right to due process when it found probable cause for aggravated vehicular homicide, failure to comply, aggravated vehicular assault, and receiving stolen property in the absence of sufficient and credible evidence that [Hughley] was the driver of the car and that he knew the car was stolen.
>
> 2. The juvenile court erred when it found that [Hughley] was not amenable to the juvenile system and transferred his case to the common pleas court for criminal prosecution.

**{¶ 2}** Finding no merit to his appeal, we affirm.

## I. Procedural History and Factual Background

**{¶ 3}** On November 17, 2017, a Ford Fusion with three young men in it, Hughley, Curtis Moore, and Delshaun Bell, collided with a Nissan Sentra with three young men in it, Mark Moore, Emmanuel Velez, and Jesse Fairley, at the corner of 78th Street and Union, in Cleveland, Ohio. The Sentra was traveling through the green light on 78th Street. The Fusion was traveling on Union Avenue, went through the red light, and hit the Sentra in the front left corner of the vehicle. The Fusion spun around and ended up in the front yard of a house on Union Avenue, about three houses away from the intersection. The Sentra ended up in front of a house on Union Avenue about five houses away from the intersection. All of the men sustained serious injuries in the crash, and Velez and Fairley died as a result of injuries they sustained from the crash.

{¶ 4} In January 2018, Hughley was charged in juvenile court with two counts of involuntary manslaughter, two counts of aggravated vehicular homicide, three counts of failure to comply, one count of aggravated vehicular assault, and one count of receiving stolen property. Hughley's date of birth was May 10, 2000, so he was 17-and-a-half years old at the time of the crash. Six days later, the state notified the juvenile court that it was intending to pursue bindover proceedings against him.

{¶ 5} The juvenile court held a probable cause hearing on the state's motion to bind Hughley over to adult court in June 2018. The state presented the following evidence at the probable cause hearing.

{¶ 6} Cleveland Police Officer Madison Demetrius testified that around 10:30 p.m. on November 17, 2017, he was patrolling the Fourth District looking for "anything suspicious." He noticed a red Ford Fusion that had foggy windows around East 131st Street and Union Avenue. He thought the car might be stolen due to the foggy windows, so he began to follow it and also ran the license plate. Officer Demetrius's suspicions were correct that the Fusion had been stolen three days earlier. Officer Demetrius could not tell how many people were in the Fusion nor could he see who was driving the car. He notified dispatch and activated the lights on his police cruiser to initiate a traffic stop at 10:35 p.m. Once he activated his overhead lights, the Fusion "accelerated." Officer Demetrius said that pursuant to police policy, he could not pursue the Fusion because officers can only pursue for violent felonies. A stolen vehicle is not considered a violent felony, so he turned his

vehicle around and went the other way. He notified other police officers who were in the area to watch for the vehicle.

**{¶ 7}** Officer Demetrius said that approximately five minutes later, he heard there was a bad accident at 78th Street and Union. He "raced" to the scene. He soon learned that one of the vehicles in the accident was the Fusion that he stopped following five minutes earlier. Officer Demetrius testified that from where he last saw the Fusion, it should have taken about ten minutes to get to where the crash occurred if the driver had been obeying all traffic laws.

**{¶ 8}** Brian Lindway testified that he was on Union Avenue stopped at a red light at the corner of 78th and Union. He said that while he was sitting at the red light, a car came up from behind him, went left of center to go around him, and crashed into a blue Nissan Sentra. Lindway estimated that the driver of the Fusion was traveling approximately 60 m.p.h., and "maybe more." Lindway pulled his vehicle over and called 911.

**{¶ 9}** Lindway testified that he saw the Fusion in the yard of a house on Union Avenue. The driver's side of the car was against the house and the passenger side was facing the street. Lindway noticed the Fusion was on fire. Lindway said that police arrived very quickly. He watched police pull two people out of the Fusion. He said he never saw anyone get out of the Fusion and run away before police got there, but he did briefly take his eyes off of the car. He further agreed that it was dark but said there were street lights.

{¶ 10} Delshaun Bell testified that on November 17, 2017, he was at the bus stop when he saw "Von" as a passenger in a vehicle. He had known "Von" for three years, but they were not friends. They played "hoop" together at Zelma George Recreation Center. Bell asked "Von" if he could "drop him off" (he did not say where) if he gave them money. Bell stated that there were three people in the car when he got in it. "Von" was in the front-passenger seat and Bell got into the back-passenger seat behind "Von." Bell said that he did not know the driver or the other back-seat passenger.

{¶ 11} Bell said that at some point after he got in the car, police began to chase them. He said that there was "just too much going on" and he was "panicking." He remembered "going down Union, and everything went white." He remembered people flipping him over, and he woke up later that night in the hospital. Bell ended up having a fractured neck and nose and a cracked jaw. He had to have a plate put in his skull. He now has memory loss and vertigo.

{¶ 12} Bell testified that he remembered police officers coming to the hospital and fingerprinting him. He said that the only thing the officers asked him was if he was driving the car. Bell said they did not ask him if not him, who was driving the car. Bell agreed that he spoke to the prosecutor just before he came into court. When the prosecutor asked him, "And outside you just told me that they might have asked you that and you might have answered it, you don't remember right?" Bell testified that he was not going to say if he told the police officers who was driving because he did not remember if he did. But he said, "I ain't going to rule

it out because I don't remember."  However, Bell denied that he said "Von" was the driver because he knew "for a fact [he] didn't."  Bell further stated that he never told a detective that "Von" picked him up to smoke marijuana, or that "Von was operating the car while it was speeding and when the accident occurred[.]"

{¶ 13} Bell stated that he remembered talking to the prosecutor on January 4, 2018, and telling him that "Ron" was the driver of the Fusion and that he knew "Ron" from "hooping" at "Zelma."  But Bell said that he only knew that the driver's name was "Ron" from the "girl dying."[1]  He said that he did not know Curtis Moore.  Bell testified that he would not lie for Hughley because they are not friends.

{¶ 14} Detective Charles Moten testified that he works in the accident investigation unit for the Cleveland Police Department.  He investigates accidents where serious injuries or fatalities are involved.  He received the present case three days after it occurred.  As part of his investigation, he interviewed Delshaun Bell at MetroHealth Hospital.  He said that Bell had head injuries, but could talk and did not appear to be confused about the accident at all.  Bell told him that "Von" had been driving and that Bell was a rear passenger in the vehicle.  Detective Moten stated that it was not possible that Bell told him "Ron" was driving the vehicle because he asked Bell if "Von was spelled "V-o-n," and Bell said yes, "Von."  Bell told Detective Moten that "Von" picked him up to go smoke marijuana and that he did not know the car was stolen.  Detective Moten said that he did not record his

---

[1] There is nothing in the record to indicate what "girl" Bell was referring to during his testimony.

conversation with Bell at the hospital because police policy prohibits officers from recording interviews that take place in a hospital due to HIPPA. He placed what he learned from Bell's interview in a written report.

{¶ 15} Cleveland Police Officer Nicholas Morley testified that on November 17, 2017, he was working the afternoon shift with his partner, Officer McNatt. He said they were headed back to the "district" to finish their reports for the day when they came upon the accident. He "called out" their location and activated his body camera. When he called out their location, dispatch stated that they had just received it. He noticed the Fusion on the front lawn of a house between a tree and the house. Officer Morley said that the driver's side of the car was about 1.5 to 2 feet from the house and the front passenger door was facing the street. Officer Morley further saw that there were "some flames" coming "from underneath the hood." He could hear people yelling, "He's trapped, get him out of there." He called EMS and the fire department.

{¶ 16} When Officer Morley got to the Fusion, he said that Curtis Moore was lying on the ground by the front passenger door. He was conscious and "moaning." Officer Morley then saw that Hughley was in the "front seat kind of laid across both seats." Officer Morley explained that Hughley was on his back and his head was hanging out of the passenger door, his upper body was on the passenger seat, and "his feet were draped over the center console towards the driver's area." He further stated that Hughley's legs were over the center console. Officer Morley testified that

two people were trying to pull Hughley out of the car. He told the two people that he would handle it.

{¶ 17} Officer Morley tried to pull Hughley out of the car by himself but was unsuccessful at first. He said that something was preventing him from doing so. He took a step back to figure out what to do. He said the flames were getting bigger. At that point, he stated that Officer McNatt grabbed Hughley's right arm and he grabbed Hughley's left arm and they gave a "big tug" and freed Hughley from the car. Officer Morley stated that he assumed that he could not get Hughley out of the car at first because Hughley's feet were stuck on something on the driver's side of the vehicle. Officer Morely said that he tried to look in the car to see if he could see what it might be, but it was too dark, and he could not see.

{¶ 18} Officer Morley stated that Hughley and Moore were conscious but moaning. He tried to ask them if there was anyone else in the car, but they did not respond. Officer Morley could not see in the back seat because the back "curtain airbags" had deployed and were blocking his view. The officers moved Hughley and Moore farther away from the burning car. At that point, Bell started to crawl out of the back-passenger door. They pulled him out of the car.

{¶ 19} Soon after they pulled Bell from the car, Officer Morley noticed the Nissan Sentra that had been in the accident. The doors to the Nissan were "jammed" and there were three unconscious men in it. They had to use machinery to get the men out of the car.

{¶ 20} The footage from Officer Morley's body camera was played in court. He identified what was occurring as the state played the video.

{¶ 21} Officer Morley admitted that he said in his report that due to the severity of the crash, he could not determine the "seating positions of the occupants in the Ford Fusion." However, Officer Morley testified that he "signed off" on Officer McNatt's supplemental report, which stated that Hughley had tried to crawl from the driver's side of the car to the passenger side of the car to get out of the vehicle. Officer Morley explained that they assumed that Hughley "became" stuck as he tried to get out of the car.

{¶ 22} Detective Darrin Robinson of the Crime Scene Unit testified that the front driver's side door of the Fusion was locked. He further stated that upon his investigation, the interior control panel of the lock mechanism of the door was damaged and did not work. While he was able to open the door with the handle from the inside because it automatically unlocked when you did so, one could not open the door by pushing the "unlock" button.

{¶ 23} The state also submitted evidence that an enrollment package for Regent High School was found in the Fusion near the driver's side of the vehicle. An enrollment specialist for the high school testified that Hughley used to attend the school but "got disenrolled" due to lack of attendance. To attend again, Hughley had to reapply. The enrollment specialist stated that neither Curtis Moore nor Delshaun Bell had ever attended the high school.

{¶ 24} The state rested.

{¶ 25} Hughley presented one witness on his behalf. Curtis Moore testified that there were four people in the Fusion that day and that Hughley was not the driver. Curtis stated that he was a back seat passenger, to the right of Bell, and that Hughley was a front seat passenger. Curtis said that he was pulled out of the vehicle.

{¶ 26} The trial court found that the state presented credible evidence that Hughley committed the offenses, which supported a finding of probable cause.

{¶ 27} The trial court held an amenability hearing a few weeks later. The parties stipulated to the Juv.R. 30 evaluation and report submitted by Dr. Ezzo of the Juvenile Court Diagnostic Clinic. The state presented three witnesses: (1) Cynthia Bouyer, (2) Mark Moore, and (3) Reanylon Fairley, Jesse Fairley's mother. The witnesses testified to the seriousness of the injuries suffered by Mark Moore and the death of Jesse Fairley. Mark Moore also testified to the serious economic harm he suffered because he did not have insurance and his car was totaled. The juvenile court found that Hughley was not amenable to rehabilitation in the juvenile justice system.

{¶ 28} It is from this decision that Hughley appeals.[2]

## II. Discretionary Bindover

{¶ 29} Under Ohio's juvenile justice system, there are two types of transfer: mandatory and discretionary. *State v. Mays*, 2014-Ohio-3815, 18 N.E.3d 850, ¶ 17

---

[2] Hughley was transferred to adult court. He pleaded guilty to an amended indictment and was sentenced to 14 years in prison in January 2019. On May 3, 2019, this court granted Hughley's motion for delayed appeal.

(8th Dist.), citing *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894.

> "Mandatory transfer removes discretion from judges in the transfer decision in certain situations. * * * Discretionary transfer, as its name implies, allows judges the discretion to transfer or bind over to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system or appear to be a threat to public safety."

*Mays* at ¶ 17, quoting *D.W.* at ¶ 10; R.C. 2152.12(A) and (B).

{¶ 30} Hughley was 17-and-a-half years old at the time of the crash and turned 18 years old in May 2018 (and thus, he was 18 years old at the time of the amenability hearing). The juvenile court transferred Hughley to the adult court pursuant to a discretionary transfer that is governed by Juv.R. 30 and R.C. 2152.12(B).

{¶ 31} R.C. 2152.12(B) states in relevant part that "after a complaint has been filed alleging that a child is a delinquent child for committing an act that would be a felony if committed by an adult, the juvenile court at a hearing may transfer the case if the court finds all of the following:

> (1) The child was fourteen years of age or older at the time of the act charged.

> (2) There is probable cause to believe that the child committed the act charged.

> (3) The child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. In making its decision under this division, the court shall consider whether the applicable factors under division (D) of this section indicating that the case should be transferred outweigh the applicable factors under division (E) of this section indicating that the case should not be transferred. The record

shall indicate the specific factors that were applicable and that the court weighed.

{¶ 32} Juv.R. 30(C) provides:

In any proceeding in which transfer of a case for criminal prosecution is permitted, but not required, by statute, and in which probable cause is found at the preliminary hearing, the court shall continue the proceeding for full investigation. The investigation shall include a mental examination of the child by a public or private agency or by a person qualified to make the examination. When the investigation is completed, an amenability hearing shall be held to determine whether to transfer jurisdiction. The criteria for transfer shall be as provided by statute.

{¶ 33} When a juvenile court improperly transfers jurisdiction over a minor to adult court, any subsequent conviction in the adult court is void for lack of jurisdiction. *State v. Washington*, 2d Dist. Montgomery No. 20226, 2005-Ohio-6546, ¶ 14, citing *State v. Wilson*, 73 Ohio St.3d 40, 44, 652 N.E.2d 196 (1995).

**A. Probable Cause**

{¶ 34} In his first assignment of error, Hughley challenges the juvenile court's probable cause findings. He argues that the juvenile court's probable cause findings for aggravated vehicular homicide, failure to comply, and aggravated vehicular assault were against the manifest weight of the evidence because the state failed to establish that he was the driver of the vehicle. He further argues that the state failed to present credible evidence of probable cause for receiving stolen property because it did not present any evidence that he knew the car was stolen.

{¶ 35} The Ohio Supreme Court has instructed that "the state must present credible evidence of every element of an offense to support a finding of probable cause, but that evidence does not have to be unassailable." *In re A.J.S.*, 120 Ohio

St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 46, citing *State v. Iacona*, 93 Ohio St.3d 83, 752 N.E.2d 937 (2001). The Supreme Court further explained, the juvenile court's role in bindover proceeding is that of a "gatekeeper" because it is "charged with evaluating whether sufficient credible evidence exists" to warrant transfer to adult court. *Id.,* citing *In re A.J.S.*, 173 Ohio App.3d 171, 2007-Ohio-3216, 877 N.E.2d 997 (10th Dist.).

{¶ 36} A juvenile court's probable cause determination in a bindover proceeding involves questions of both fact and law. *A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 51. An appellate court will defer to the juvenile court's "determinations regarding witness credibility, but [will] review de novo the legal conclusion whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged." *Id.* "The 'probable' component of the probable cause determination means that the state must produce evidence that 'raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt.'" *State v. Taylor*, 8th Dist. Cuyahoga No. 106502, 2018-Ohio-3998, ¶ 4, quoting *A.J.S* at ¶ 42.

### 1. Identity of the Driver

{¶ 37} We will address Hughley's arguments out of order for ease of discussion. Hughley argues that the state's evidence that he was the person driving the Ford Fusion "could not credibly support a finding of probable cause for aggravated vehicular homicide, failure to comply, and aggravated vehicular assault."

Because Hughley only challenges the state's evidence regarding the driver's identity, we will not address the other elements of these offenses.

{¶ 38} After reviewing the evidence in this case, we find that the state presented credible evidence to support probable cause that Hughley was driving the Fusion. Officers Morley and McNatt arrived on the scene before any other officers. In fact, they came upon the accident before they had received a dispatch that it had occurred. They found the Fusion near a house where a bunch of people had gathered. The driver's side of the Fusion was very close to the house, approximately 1.5 to 2 feet from the house. From the photos, it appears as if the driver's side area of the Fusion was up against some shrubbery that was in front of the house, or the Fusion had run over some shrubbery before it landed in its final position because there were large branches and greenery under the car and between it and the house. The photos also show that the front of the Fusion was severely damaged by the crash.

{¶ 39} Officer Morley testified that when he and Officer McNatt walked up to the car, Curtis Moore was lying on the ground. Two other people were trying to pull Hughley out of the car through the front passenger door. Officer Morley described how Hughley was lying across the two front seats with his head hanging out of the passenger side door and his body spread across the seats with his upper body on the passenger seat and his legs and feet towards the driver's side of the car. He attempted to pull Hughley out of the car by himself but was unsuccessful. He said that it appeared as if Hughley's feet were stuck on something or wedged between something on the driver's side of the car. He and Officer McNatt then tried

to get Hughley out of the car together and they were able to pull him out of the Fusion.

{¶ 40} Hughley argues that Officer Morley acknowledged in his report that the due to the violent nature of the crash, it was difficult to determine who was sitting where. Nonetheless, Officer Morley testified that he signed the report written by Officer McNatt, which stated that it appeared as if Hughley was trying to crawl out of the vehicle through the passenger side but he could not do so because his feet were stuck on something.

{¶ 41} Further, although Bell testified at the probable cause hearing that "Von" was a front-seat passenger in the vehicle, Detective Moten explained that Bell told him in the hospital that "Von" was the driver and that he (Bell) was a passenger in the back. Bell identified "Von" in court as Hughley. Hughley argues that Bell's hospital statements are not credible because Bell had a head injury and woke up surrounded by police officers. Hughley maintains that it is much more likely that his testimony at the probable cause hearing — that "Von" was in the front passenger seat — was the truth. However, Detective Moten said that although Bell was injured, he could talk and did not appear to be confused about the accident at all.

{¶ 42} Hughley further argues that the state's evidence that police found high school enrollment papers on the driver's side of the Fusion only proved that he was in the vehicle, not that he was the driver of the vehicle. We agree with Hughley on this point. The papers could have flown about the vehicle as it spun three houses down from the intersection of East 78th Street and Union Avenue. Nonetheless,

based on the state's other evidence, we find that it presented credible evidence that Hughley was the driver of the Fusion at the time of the crash.

{¶ 43} Further, although Bell and Moore testified at the bindover hearing that Hughley was a front-seat passenger in the vehicle and not the driver, the juvenile court also heard the testimony of the officers who were at the scene as well as the detectives who investigated the crash afterwards, and determined that there was probable cause to believe that Hughley was the driver.

{¶ 44} Accordingly, we find that the state presented credible evidence to support probable cause that Hughley was driving the Fusion.

### 2. Receiving Stolen Property

{¶ 45} Hughley further argues that the state failed to present evidence that he "knew or had reasonable cause to believe that the Ford Fusion was obtained through the commission of a theft offense."

{¶ 46} R.C. 2913.51(A) provides: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." After review, we find that the state presented credible evidence — albeit circumstantially — that Hughley was aware that the car was stolen.

{¶ 47} When a disputed element of an offense is not susceptible of proof by direct evidence, circumstantial evidence may be used to provide an inference of guilt. *State v. Hollstein*, 6th Dist. Lucas No. L-08-1164, 2009-Ohio-4773, ¶ 27. Thus, for receiving stolen property, the state may use circumstantial evidence in

order to prove that appellant had the requisite knowledge or that he had reasonable cause to believe the items were stolen. *In re Lame*, 11th Dist. Portage Nos. 96-P-0265, 96-P-0266, and 96-P-0267, 1998 Ohio App. LEXIS 4532, 9 (Sept. 25, 1998).

{¶ 48} After review, we conclude that the state presented credible evidence to establish probable cause that Hughley was aware that the Ford Fusion was stolen. As we already concluded, the state presented credible evidence that Hughley was driving the Ford Fusion that had been stolen just three days previously. And when he saw that Officer Demetrius activated his overhead lights, Hughley accelerated the Fusion rather than stopped the vehicle. Flight from police officers is circumstantial evidence that the driver was aware that the vehicle he was in was stolen. *State v. McNeir*, 6th Dist. Lucas No. L-99-1406, 2000 Ohio App. LEXIS 5562, 15-16 (Nov. 30, 2000).

{¶ 49} Having found that the state presented credible evidence to establish probable cause that Hughley was the driver of the Fusion and that he was aware the Fusion was stolen, we overrule Hughley's first assignment of error.

**B. Amenability**

{¶ 50} In his second assignment of error, Hughley argues that the juvenile court erred when it determined that he was not amenable to rehabilitation in the juvenile system.

{¶ 51} In instances of discretionary transfer:

[I]f probable cause exists and the child is eligible by age, the juvenile court must then continue the proceeding for a full investigation. R.C. 2152.12(C) and Juv.R. 30(C). This investigation includes a mental

examination of the child, a hearing to determine whether the child is "amenable to care or rehabilitation within the juvenile system" or whether "the safety of the community may require that the child be subject to adult sanctions," and the consideration of 17 other statutory criteria to determine whether a transfer is appropriate. Juv.R. 30(C); R.C. 2152.12(B), (C), (D), and (E).

*In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 12.

{¶ 52} In making the amenability determination, the juvenile court must consider whether the applicable factors under R.C. 2152.12(D) indicating that the case should be transferred outweigh the applicable factors under R.C. 2152.12(E) indicating that the case should not be transferred. R.C. 2152.12(B)(3); *State v. Jones*, 8th Dist. Cuyahoga No. 99044, 2013-Ohio-3725, ¶ 8. Additionally, aside from the specifically enumerated factors, the juvenile court is instructed to consider "any other relevant factors." *Id.*, citing R.C. 2152.12(D) and (E). "The record shall indicate the specific factors that were applicable and that the court weighed." R.C. 2152.12(B)(3). Further, when the trial court determines a transfer is proper, the juvenile court "shall state the reasons for the transfer on the record." R.C. 2152.12(I); *see also* Juv.R. 30(G).

{¶ 53} We review a juvenile court's amenability determination under R.C. 2152.12 pursuant to an abuse of discretion. *Jones* at ¶ 9, citing *A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629. Indeed, a "juvenile court enjoys wide latitude to retain or relinquish jurisdiction." *State v. Watson*, 47 Ohio St.3d 93, 95, 547 N.E.2d 1181 (1989). The term "abuse of discretion" is one of art, "connoting judgment exercised by a court, which does not comport with reason or the record."

*State v. Underwood*, 11th Dist. Lake No. 2008-L-113, 2009-Ohio-2089, ¶ 30, citing *State v. Ferranto*, 112 Ohio St. 667, 148 N.E. 362 (1925). Stated differently, an abuse of discretion is the trial court's "failure to exercise sound, reasonable, and legal decision-making." *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, quoting *Black's Law Dictionary* 101 (8th Ed.2004).

**1. Statutory Factors for Determining Amenability**

{¶ 54} When determining whether to transfer a child to the trial court for adult prosecution, R.C. 2152.12(D) requires that a juvenile court consider the following relevant factors in favor of transfer (because they weigh in favor of finding that the juvenile is not amenable to rehabilitation in the juvenile justice system):

> (1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.
>
> (2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.
>
> (3) The child's relationship with the victim facilitated the act charged.
>
> (4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.
>
> (5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.
>
> (6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 55} Additionally, R.C. 2152.12(E) requires that the juvenile court consider the following relevant factors against a transfer (because they weigh in favor of finding that the juvenile is amenable to rehabilitation in the juvenile justice system):

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or is a mentally retarded person.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

## 2. Psychological Evaluation

{¶ 56} The psychologist who evaluated Hughley stated that since he had been confined in the juvenile detention center, Hughley had been charged with

assault that occurred in the detention center on March 15, 2018. The psychologist further stated that "it was ascertained that there is likely going to be another assault charge" against Hughley that occurred in the detention center at the end of June 2018.

{¶ 57} According to the report, Hughley had two prior delinquency cases, including a 2015 case where Hughley was adjudicated delinquent of aggravated riot, aggravated trespass, and two counts of disorderly conduct and a 2016 case where he was adjudicated delinquent for carrying a concealed weapon and two counts of possession of a deadly weapon in a school safety zone. These cases "resulted in a disposition of an Ohio Department of Youth Services Commitment – Suspended, Community Control for nine months, and 50 hours of Community Service." Hughley's probation was terminated on May 15, 2017. The psychologist explained that the charges in the present case arose six months after Hughley's probation was terminated.

{¶ 58} The psychologist reported that Hughley was involved in the juvenile court's "Cognitive Behavior Therapy." Hughley reported that the therapy really helped him control his anger and realize that fighting was "not even worth it." But the psychologist stated that despite what Hughley said, he had been charged with assault at least once and probably twice while he had been in the detention center for the present case.

{¶ 59} The psychologist stated that Hughley "had a good understanding of the charges" and his "thought processes were appropriate to the context of the evaluation." His "affect (degree of emotional expression) was normal."

{¶ 60} The psychologist explained that he weighed the factors that supported Hughley remaining in the juvenile system with the factors that supported transferring Hughley to adult criminal court. The psychologist stated that it would only address the relevant criteria. The psychologist found that the factors that support retaining him in the juvenile system were (1) the fact that Hughley may not be the principal actor, which "will have to be addressed through testimony," and (2) "[t]here is sufficient time to rehabilitate [Hughley] with the Juvenile Justice System since [it] can retain jurisdiction until the age of 21."[3] The psychologist further found that "other non-statutory factors" in favor of retaining Hughley in the juvenile justice system were (1) [l]ater onset of behavior problems, (2) [s]trong support system with his mother, and (3) [m]isconduct with peers rather than acting alone.

{¶ 61} The psychologist noted that if the facts "support [Hughley's] involvement in the acts with which he has been charged," the following factors support the finding that Hughley was not amenable to the "care and rehabilitative services available" through the juvenile justice system: (1) there were two deaths, (2) Hughley previously received cognitive behavior therapy when he was on probation and reported that he benefited from the therapy, but he had been charged with

_____

[3] The report was completed before the probable cause hearing.

assault while being held in the juvenile detention center in this case, (3) Hughley was emotionally, physically, and psychologically mature enough for transfer to adult court. The psychologist further found that "other non-statutory factors" in favor of transferring Hughley out of the juvenile justice system were (1) poor anger management and impulsivity, (2) poor academic achievement, and (3) although "there was no specific inquiry about [Hughley's] thoughts about the victims," he did not offer any empathy about the deaths and their surviving relatives during the evaluation.

### 3. Juvenile Court's Judgment and Analysis

{¶ 62} The juvenile court first reviewed the factors against transfer under R.C. 2152.12(E). It found that the factors R.C. 2152.12(E)(1) through (7) against transferring Hugley out of the juvenile justice system did not apply. Regarding the eighth factor under R.C. 2152.12(E)(8), the court noted that Dr. Ezzo found that there was sufficient time to rehabilitate Hughley in the juvenile system.

{¶ 63} Regarding the factors in favor of transfer under R.C. 2152.12(D), the juvenile court found that R.C. 2152.12(D)(1) applied because the victims suffered physical or psychological harm or serious economic harm because Hughley's actions. The court then found that Dr. Ezzo's report "was a little bit unclear" regarding whether "the results of any previous sanctions or programs" indicated that rehabilitation would not occur. Because of that, the court found that R.C. 2152.12(D)(7) did not weigh in favor of retaining Hughley in the juvenile system. The court further found that Dr. Ezzo's report indicated that R.C. 2152.12(D)(8)

applied in favor of transfer because Hughley was emotionally, physically, and psychologically mature enough for transfer to adult court.

{¶ 64} After weighing the applicable factors for and against transfer, the juvenile court found that Hughley was not amenable to rehabilitation and that the safety of the community required that he be subject to adult sanctions.

{¶ 65} Hughley argues that the juvenile court's decision to transfer him to adult court "is not supported by the record, and defies the governing body of juvenile court judges' guidelines that the 'transfer of juveniles to adult court should be rare.'" He further maintains that the juvenile court did not consider any of the disposition options that were available in the juvenile system to rehabilitate Hughley before he turned 21 years old.

{¶ 66} After review, we conclude that the juvenile court did not abuse its discretion. The juvenile court explicitly weighed the factors for and against transfer outlined in R.C. 2152.12. Hughley had already turned 18 years old by the time of the amenability hearing. The juvenile court and Dr. Ezzo both agreed that Hughley was emotionally, physically, and psychologically mature enough for the transfer. Further, the doctor concluded that Hughley did not have any significant emotional, physical, or psychological issues.

{¶ 67} Although the juvenile court disagreed with Dr. Ezzo's conclusion that there was sufficient time to rehabilitate Hughley in the juvenile system, the juvenile court is not bound by expert opinions in determining whether the child is amenable to rehabilitation. *State v. Williams*, 9th Dist. Lorain No. 91CA005054, 1991 Ohio

App. LEXIS 5388, 7 (Nov. 6, 1991). Moreover, the expert also found that there were more factors present against retaining Hughley in the juvenile justice system.

{¶ 68} The juvenile court considered the fact that the harm in this case was severe. Two people died and one was permanently altered from the injuries he sustained in the crash. Further, this was not a case where the juvenile crashed his vehicle while not paying attention. The events that occurred just prior to the crash magnify the seriousness of Hughley's offenses. In an effort to escape the police, Hughley travelled at a high rate of speed for over five minutes, ultimately running a red light and hitting a car that had a green light while driving through the intersection. And as one witnessed testified, Hughley was travelling at 60 m.p.h. or more when he hit the Nissan Sentra. The Ohio Supreme Court has held the seriousness of the alleged act is relevant to "the assessment of the probability of rehabilitating the child within the juvenile justice system" because the more serious the offense, the less amenable the juvenile will be to rehabilitation in the juvenile system. *Watson*, 47 Ohio St.3d at 95, 547 N.E.2d 1181.

{¶ 69} Under these circumstances, we cannot say that the juvenile court abused its discretion when it determined that Hughley was not amendable to rehabilitation in the juvenile justice system. Thus, we overrule Hughley's second assignment of error.

{¶ 70} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., and
MARY EILEEN KILBANE, J., CONCUR