[Cite as *State v. Saleem*, 2024-Ohio-3162.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230401 |
| | | TRIAL NO. B-2105357 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| RASHAD SALEEM, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: August 21, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller,* Hamilton County Public Defender, and *Sarah E. Nelson,* Assistant Public Defender, for Defendant-Appellant.

**Bock, Presiding Judge.**

{¶1} Following a string of robberies, defendant-appellant Rashad Saleem was convicted of aggravated robbery, receiving stolen property, and three drug-possession offenses. He challenges those convictions in two assignments of error.

{¶2} First, he argues that the trial court committed plain error by admitting a crime laboratory report to prove the identity of substances because the State's noncompliance with R.C. 2925.51 rendered it inadmissible. We hold that Saleem's attorney's litigation conduct waived any challenge to the admissibility of the report.

{¶3} Saleem also claims that there was insufficient evidence to convict him of receiving stolen property because there was no proof that he knew he was driving a stolen truck. But a rational juror could infer his knowledge through circumstantial evidence, including footage of Saleem wearing the truck owner's missing clothes and testimony describing his flight from officers and attempt to discard the truck keys.

{¶4} Finally, Saleem argues the evidence is insufficient to convict him of aggravated robbery because the evidence failed to credibly establish the identity of the individual who robbed the convenience store at gunpoint. But a rational juror could find that Saleem's cast matched the perpetrator's cast, and that footage of another theft shows Saleem wearing the distinct clothing worn by the perpetrator.

{¶5} We overrule Saleem's assignments of error and affirm his convictions.

## I. Facts and Procedure

{¶6} In October 2018, D.K. was at a gas station when a man stole his truck at gunpoint. The next day, police thwarted an attempted retail theft at Nordstrom Rack in Norwood, Ohio. And the day after that, a gunman robbed a United Dairy Farmers

("UDF") convenience store in Norwood. Later in October 2018, police arrested Saleem after he was spotted driving the stolen truck in Cincinnati, Ohio.

{¶7}   The State charged Saleem with seven felonies: aggravated robbery under R.C. 2911.01(A)(1) and robbery under R.C. 2911.01(A)(2) for the UDF robbery; receiving stolen property under R.C. 2913.51(A) for driving the stolen truck; and possession of cocaine, fentanyl, flourofentanyl, and buprenorphine in violation of R.C. 2925.11(A) for substances in small bags and a crack pipe recovered from Saleem.

{¶8}   Weeks before trial, the State sent Saleem's attorney a notice "[p]ursuant to the requirements of O.R.C. 2925.51(B), the lab report of the Hamilton County Coroner's Institute of Forensic Medicine, Toxicology and Criminalistics." The lab report warned:

> TO THE ACCUSED: You have a right to demand the testimony of the
> person making this report, except when the report is used as part of the
> preliminary hearing or the Grand Jury proceeding, upon giving notice
> prior to the trial to the Prosecuting Attorney in accordance with the
> Rules of Criminal Procedure.

### *Jury trial*

{¶9}   At Saleem's trial, D.K., the owner of the stolen truck, described being robbed at gunpoint at a Northern Kentucky gas station. While speaking to a friend who was parked behind his truck, he saw "somebody standing perfectly aligned at my driver's door holding a gun at me." The gunman threatened them—"if we followed him, [] he would kill us." The gunman was holding what "[k]ind of looked from a distance like an AR-15." The gunman made off with "plenty of valuables" in the truck, including

3

a 9-millimeter IWI Masada pistol, an iPhone, a "red Puerto Rico hat," and Pepsi-branded clothes made exclusively for Pepsi employees.

{¶10}  Roughly one week later, D.K. tracked his iPhone to an address in the Walnut Hills neighborhood in Cincinnati. D.K. and a friend found his truck "sitting in front of like an old rundown brown project-looking building, and it was just sitting right outside." His "Kentucky license plate was still on the vehicle." D.K. called the police. But while they waited for the police, a man later identified as Saleem "came out, got in the vehicle." The two followed him a few blocks to a nearby gas station. Law enforcement arrived at the gas station and arrested Saleem. D.K.'s work shirts, red hat, iPhone, and gun were missing.

{¶11}  Days later, Norwood Police Sergeant Matthew Klingelhoffer contacted D.K. and asked about the missing personal property. Klingelhoffer sent him photographs of an armed robbery of a UDF in Norwood, Ohio:



D.K. spotted his missing property "right away. I saw my gun. I saw my hat. I saw my work shirt. I felt like I was being framed." He knew it was his IWI Masada because of the markings on the gun, the color, and the imprints. And he testified, "there is no question that is my hat." Plus, the gunman appeared to be wearing his "employee-

issued" blue Pepsi sweater. While the gunman was wearing a cast in the photo, D.K. could not say for certain if the man who stole his truck was wearing a cast because "it was so dark, I couldn't see. You are not looking for that at 3 o'clock in the morning."

{¶12} The UDF assistant manager testified that he was behind the counter when a man approached "with a candy bar in his hand," "pull[ed] out a gun," and demanded money. The assistant manager "was frightened, basically, and afraid," so he gave the gunman "the money and he walk[ed] out." While the assistant manager remembered the red hat, blue fleece, and cast on the gunman's hand, his focus was on the gun. The assistant manager could not identify the gunman, who was wearing a mask throughout the robbery. The State played the surveillance footage of the robbery.

{¶13} Klingelhoffer described his investigation and, when reviewing the UDF surveillance footage, noticed "a couple very distinct articles of clothing and wrap on the wrist." During his investigation, Klingelhoffer received a report describing an attempted theft at Nordstrom Rack the day before the UDF robbery. After watching the Nordstrom Rack surveillance footage, Klingelhoffer concluded "that the hat that was in the Nordstrom Rack video was very similar with the same lettering and flag back at the UDF." After the State played the Nordstrom Rack footage, Klingelhoffer testified that, "noticeable around the left hand area, there is a wrap on the same left wrist area present during the UDF video."

{¶14} Klingelhoffer remarked that the truck owner's IWI Masada pistol is "a rare firearm." He pointed out in the UDF footage that "the firearm appears to have an accessory rail on the front. It has a large trigger guard, square in nature, which would be similar of an IWI Masada and not a Glock." Also, the top "is slightly rounded" and the front has "several notches, which is an accessory rail to mount different objects

onto a firearm. This is pretty unique. It is very similar to an IWI Masada. Also . . . the trigger guard is large and pronounced. It is almost like a perfect 90-degree angle."

{¶15}   Klingelhoffer also came across a local news report describing a theft at a Family Dollar two days before Saleem's arrest. The thief resembled the shoplifter in the Nordstrom Rack footage because of "a wrap around his left wrist hand area, and he had very distinct-looking red shoes with a white stripe around the bottom, very similar to the shoes that are shown in the Nordstrom Rack video." The Family Dollar thief "fled in a stolen motor vehicle out of Kentucky." Klingelhoffer confirmed that the vehicle used at the Family Dollar was, in fact, the truck stolen in northern Kentucky.

### *Saleem's arrest*

{¶16}   Officer Dezarn responded to D.K.'s 911 call after he tracked his iPhone and followed his truck to a gas station. There, Dezarn held the stolen truck at gunpoint. Dezarn testified that the driver left the truck and walked away in "[a]lmost a panicked manner." Dezarn identified Saleem as the driver. Saleem "threw the keys for the stolen vehicle across the parking lot." Dezarn tased and arrested Saleem. Detective Glecker recovered "crack cocaine" from Saleem's wallet and searched his clothing at the gas station. The State introduced a bodycam still of the arrest:



{¶17} Dezarn took Saleem to the hospital to treat injuries caused by the taser. When he opened Saleem's door, he saw "one baggie of powder on the ground and another baggie on the seat" between Saleem's legs. As he walked Saleem into the hospital, "Saleem threw something into the landscaping next to the door, which I recovered. It was a crack pipe."

{¶18} Dezarn testified that the substances were tested by "the crime lab." The prosecutor handed Dezarn the lab technician's report, and without any objection, Dezarn testified that the report identified the substances as "[a] mix between fluorofentanyl and fentanyl," cocaine, and buprenorphine.

{¶19} Glecker, the officer who searched Saleem's wallet and clothing, testified that he "came across two baggies that looked to be drugs and that were later tested." Without any objection, Glecker testified that lab tests identified the substance in those bags as cocaine.

{¶20} Klingelhoffer testified that when he interviewed Saleem, Saleem admitted that he had attempted to steal shoes at Nordstrom Rack but was stopped by plain-clothed security guards. Saleem told Klingelhoffer that he had sprained his wrist throwing a football. And he told Klingelhoffer he struggled with addiction, unemployment, and homelessness. Klingelhoffer testified that Saleem "said his drug of choice was cocaine, but fentanyl was getting mixed into it and it was making him feel different." While Klingelhoffer asked Saleem "numerous times if he [robbed the UDF]," Saleem maintained his innocence. And when he asked about driving the truck owner's vehicle, Saleem explained that "he received [the truck owner's vehicle] from somebody . . . and that he purchased the vehicle for a loan with $50 of crack."

7

{¶21} The trial court admitted the substances found at the gas station and hospital, along with the lab report signed by the forensic scientist reporting the weight and identity of the substances. When the trial court remarked that exhibit 7, the lab report, was stipulated, the prosecutor responded, "Yes, Judge." The lab report showed that substances recovered were fluorofentanyl, fentanyl, cocaine, and buprenorphine.

### Saleem testified

{¶22} Saleem's testimony described his personal losses that led to his struggles with addiction. Before his arrest, Saleem was using "heroin more than anything else," but "[s]ometimes crack or cocaine." Saleem admitted his involvement in the Nordstrom Rack theft but explained that he did it with "two other guys." One was the driver and the other, Saleem's friend, "went into the store after I did." Saleem testified that he was wearing glasses and a hat, while his friend "had on a red hat, but I don't know what kind of hat. He said it was a Puerto Rico hat."

{¶23} Saleem knew a drug dealer in Walnut Hills, who sold heroin and crack at "the drug house that everyone" uses. He testified that he rented the truck from the dealer, explaining that most things at the dealer's house "is stolen except people's vehicles." The dealer let Saleem "use the [truck] for $50 of crack." Police arrested Saleem with the stolen truck at a gas station "because [he] had to put the gas back" in the truck. In fact, according to Saleem, the dealer was with Saleem at the gas station but was in the store when Saleem was arrested. Saleem testified, "I threw a little bitty baggie of crack. That's what I had in my hand." He also testified that he had "some crack and some heroin" when he was arrested. And "[t]here was fentanyl."

{¶24} The jury found Saleem guilty of all counts and firearm specifications. The trial court imposed an aggregate ten-year sentence for the offenses after merging

8

the robbery count into the aggravated robbery count, and the possession-of-a-fentanyl-related-compound count into the possession-of-fentanyl count. Saleem appeals his convictions in two assignments of error.

## II.    Law and Analysis

### *Admitting the lab report was not plain error*

{¶25}  In his first assignment of error, Saleem challenges the admission of the lab report for two reasons. He argues that the State's noncompliance with R.C. 2925.51's notice requirement rendered the lab report inadmissible and that admitting the lab report violated his constitutional right to confront witnesses.

A.  Defendants must have notice of the right to demand a lab analyst's testimony

{¶26}  Saleem concedes that he failed to argue below that the lab report was inadmissible due to the State's noncompliance with R.C. 2925.51. Under Evid.R. 103(A)(1), an "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . timely objection or motion to strike appears of record stating the specific ground of objection." Saleem also failed to raise his Confrontation Clause objection to the trial court. *See State v. Houston*, 2018-Ohio-3043, ¶ 25 (8th Dist.) ("We have applied the plain error doctrine to instances where the appellant failed to object to an alleged confrontation clause error at trial.").

{¶27}  When parties fail to raise an objection at trial, they forfeit all but plain error. *See State v. Robertson*, 2023-Ohio-2602, ¶ 16 (1st Dist.). Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." A party asserting plain error must show (1) a "deviation from a legal rule," (2) that was "plain, in that there must be an obvious

9

defect in the trial proceedings," and (3) that the error "affected substantial rights, meaning that 'the trial court's error must have affected the outcome of the trial.'" *State v. Browner*, 2024-Ohio-1547, ¶ 8 (1st Dist.), quoting *State v. Garrett*, 2022-Ohio-4218, ¶ 63. Plain error is limited to "exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Gordon,* 2018-Ohio-259, ¶ 23.

**{¶28}** R.C. 2925.51, which governs the use of laboratory reports in cases involving drug offenses, specifies the conditions under which a laboratory report serves as prima-facie evidence of the character of substances being tested at the laboratory. *See State v. Stephens*, 126 Ohio App.3d 540, 551 (1st Dist. 1998). Relevant here, a laboratory report constitutes prima-facie evidence of a substance's identity, weight, and content when the prosecutor serves the report on defendant's counsel before trial, and the report contains notice that the defendant may demand that the report's author—the laboratory analyst—testify and the manner in which the accused shall make that demand, unless the defendant, within seven days after the defendant receives the report, serves upon the prosecutor a demand for the author's testimony. R.C. 2925.51(B), (C), and (D). The trial court may extend the seven-day period for the defendant to demand the author's testimony. R.C. 2925.51(C).

**{¶29}** This statutory requirement "is not a discovery measure; rather it is evidentiary in nature providing a specific, statutory exception to the hearsay rule." *State v. Bates*, 2004-Ohio-2219, ¶ 9 (3d Dist.). And when the State seeks to introduce the report in lieu of the laboratory analyst's testimony, the State's failure to instruct a defendant to demand the laboratory analyst's testimony within seven days of the defendant receiving the laboratory report generally renders the report inadmissible. *Id.* These instructions are "the most important provision in the statutory language

from the defendant's standpoint, involving the specific manner and time frame necessary to assert and preserve the defendant's right to the testimony of a witness involving an essential element of a drug offense." *Id.* at ¶ 7.

B. The trial court did not commit plain error

**{¶30}** Though the State notified Saleem that he had the right to demand the lab analyst's testimony by giving notice to the prosecutor, the notice failed to inform Saleem that he had seven days to demand the lab analyst's testimony.

**{¶31}** Saleem points out that this court has held "that failure to serve the report and to include all of the necessary information as specifically required by the statute would have rendered [the lab report] inadmissible." *State v. Greenway*, 2017-Ohio-7729, ¶ 15 (1st Dist.) (lab report lacked a notarized affidavit); *see State v. Bethel*, 2002-Ohio-5437, ¶ 9 (5th Dist.).

**{¶32}** But Saleem did more than simply forfeit this challenge–he waived it. *See State v. Quarterman,* 2014-Ohio-4034, ¶ 15. While failing to raise an objection at trial forfeits all but plain error, "waiver is the 'intentional relinquishment or abandonment of a known right.'" *Id.*, quoting *United States v. Olano*, 507 U.S. 725, 733 (1993), quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *see State v. Rogers*, 2015-Ohio-2459, ¶ 20. In contrast to a forfeited argument, waiver acts to ""extinguish an error."" *Id.,* quoting *Olano* at 733, quoting *Zerbst* at 464; *see State v. Powell,* 2021-Ohio-200, ¶ 47, fn. 1 (4th Dist.).

**{¶33}** In the course of litigation, "parties 'may waive certain rights which are given them in a court of justice; they may agree that certain facts exist, without other proof of their existence; a party may waive exception to evidence not technically legal.'" *State v. Tate*, 2014-Ohio-44, ¶ 19, quoting *Gittings v. Baker*, 2 Ohio St. 21, 23-24

(1853). Waiver is not limited to statutory rights; rather, a defendant's counsel may waive the defendant's Sixth Amendment confrontation right in appropriate situations, and R.C. 2925.51 "presents such an appropriate situation." *State v. Pasqualone*, 2009-Ohio-315, ¶ 33.

**{¶34}** When a defendant fails to exercise certain rights before trial, that inaction can waive those rights. *Id.* at ¶ 40. R.C. 2925.51(C) embodies this principle, as inaction "waive[s] the right to have the analyst testify at trial and to cross-examine him." *Greenway*, 2017-Ohio-7729, at ¶ 15 (1st Dist.); *see Pasqualone* at ¶ 44.

**{¶35}** Relevant here, a stipulation between the parties will "waive the necessity to produce evidence or the authentication of evidence." *Meyer v. Meyer*, 2008-Ohio-436, ¶ 22 (5th Dist.); *see State v. Keck,* 2013-Ohio-5160, ¶ 17 ("By stipulating to [the analyst]'s report, [the defendant] waived any argument that the report was inadmissible or inaccurate. By stipulating, [the defendant] agreed that the report was admissible and a truthful representation of [the analyst]'s findings; he could no longer assert any right to confront [the analyst].").

**{¶36}** While the State failed to inform Saleem of his seven-day deadline for demanding the laboratory analyst's testimony, it did inform him of his "right to demand the testimony of the person making this report . . . upon giving notice before the trial to the [p]rosecuting [a]ttorney." Saleem failed to demand that testimony at any point before trial.

**{¶37}** In his opening statement, Saleem's attorney explained,

There is not going to be much argument about the actual evidence but, rather, what does that evidence mean, particularly with regard to the drugs. There will be no question as to whether or not Mr. Saleem had

those drugs and they are illegal drugs. We are not contesting that. We

expect you to find him guilty on the drug charges.

{¶38} Later, Saleem acquiesced to the prosecutor's statement that the parties

had agreed to stipulate to the admission of the lab report. And Saleem failed to object

when Officer Dezarn testified about the contents of the laboratory report and to Officer

Glecker's testimony that testing identified the substance in Saleem's wallet as cocaine.

{¶39} Saleem waived any error involving the trial court's admission of the lab

report as prima-facie evidence of the substances and his Sixth Amendment right to

confront the laboratory analyst. We overrule his first assignment of error.

*The evidence supports Saleem's convictions*

{¶40} In his second assignment of error, Saleem challenges his aggravated-

robbery and receiving-stolen-property convictions on sufficiency and manifest-weight

grounds. Specifically, he argues that the State failed to introduce evidence that he

knew the vehicle was stolen and therefore failed to establish his mens rea for the

receiving-stolen-property offense. Second, he argues that the State's evidence was

insufficient to establish Saleem as the UDF robber.

{¶41} To review the sufficiency of the evidence, we view the evidence in a light

favorable to the State to determine if a reasonable fact finder could conclude that the

State proved beyond a reasonable doubt all the elements of each offense. *State v.*

*Jeffries*, 2018-Ohio-2160, ¶ 62 (1st Dist.).

{¶42} A conviction supported by sufficient evidence can nevertheless be set

aside as against the manifest weight of the evidence. *State v. Myers*, 2018-Ohio-1903,

¶ 140. In a manifest-weight challenge, we must independently review the evidence

without viewing the evidence in a light favorable to the State. *See State v. Plymale*,

2016-Ohio-3340, ¶ 26 (4th Dist.). Specifically, we must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of all witnesses to determine if the  jury clearly lost its way and created a manifest miscarriage of justice. *See State v. McKelton*, 2016-Ohio-5735, ¶ 328.

A.  Circumstantial evidence establishes Saleem's knowledge

**{¶43}** Beginning with his receiving-stolen-property conviction, the evidence must show that Saleem "receive[d], retained[ed], or dispose[d] of property of another knowing or having reasonable cause to believe that the property had been obtained through the commission of a theft offense." R.C. 2913.51(A). Saleem was driving the stolen truck when he was arrested, so his arguments are limited to his knowledge that the truck was stolen.

**{¶44}** Under R.C. 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." Knowledge "is rarely shown by direct evidence." *State v. Benson*, 2019-Ohio-3255, ¶ 39 (1st Dist. ). Absent a defendant's admission, knowledge "'can only be determined from all the surrounding facts and circumstances.'" *State v. Gerth*, 2013-Ohio-1751, ¶ 10 (1st Dist.), quoting *State v. Huff*, 145 Ohio App.3d 555, 563, (1st Dist. 2001).

**{¶45}** Here, testimony established that when officers drew their weapons toward the stolen truck, Saleem got out of the truck, "started to walk away . . . quickly," and threw the keys across the parking lot. Ohio courts have held that "possession of [a] vehicle coupled with [] flight from the police" are circumstances that can prove a defendant's knowledge. *State v. Hall*, 2009-Ohio-5695, ¶ 24 (8th Dist.); *see Gerth* at

¶ 14; *see also State v. Patterson*, 2018-Ohio-3348, ¶ 52 (1st Dist.); *State v. Hughley*, 2020-Ohio-1277, ¶ 48 (8th Dist.) ("Flight from police officers is circumstantial evidence that the driver was aware that the vehicle he was in was stolen."); *State v. James*, 2009-Ohio-3284, ¶ 25 (8th Dist.) (holding that ignoring commands and flight "suggest a consciousness of guilt and are circumstantial evidence that he was aware that the Jeep was stolen"). Saleem not only attempted to flee, but also threw the keys across the parking lot. Tossing stolen goods can be proof that a defendant "decided to get rid of what he knew was stolen property in case the police apprehended him." *State v. McCay*, 2007-Ohio-4051, ¶ 40 (8th Dist.).

{**¶46**} A reasonable juror could conclude that Saleem knew the truck was stolen. The evidence was sufficient to convict Saleem of receiving stolen property.

{**¶47**} Saleem also argues that his conviction is against the manifest weight of the evidence, because the evidence failed to credibly establish that he knew the truck was stolen. Saleem relies on his testimony to argue that the jury's verdict was against the manifest weight of the evidence. At trial, Saleem testified that he borrowed the car from a drug dealer, that the drug dealer frequently loaned cars, and he had borrowed other cars in the past. On the day of his arrest, he went to the gas station because he was in the process of returning the car to the drug dealer.

{**¶48**} Saleem is correct that "an appellate court may review credibility when considering the manifest weight of the evidence." *State v. Brown*, 2024-Ohio-2148, ¶ 17 (1st Dist.). But we have also held that "the credibility of witnesses is primarily an initial determination for the trier of fact." *Id.* The jury is in the best position "'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting

*State v. Wilson,* 2007-Ohio-2202, ¶ 24. Indeed, we have cautioned that appellate courts must "'bear in mind the trier of fact's superior, first-hand perspective in judging the demeanor and credibility of witnesses.'" *Id.* at ¶ 19, quoting *State v. Mickens*, 2009-Ohio-1973, ¶ 30 (10th Dist.).

**{¶49}** There is nothing to suggest that the jury lost its way and created a miscarriage of justice when it found Saleem guilty of receiving stolen property.

B. <u>Saleem's aggravated-robbery conviction was supported by the evidence</u>

**{¶50}** To convict Saleem of aggravated robbery, the State's evidence must prove that Saleem robbed the UDF with a deadly weapon. *See* R.C. 2911.01(A)(1). Saleem argues that there is no proof that *he* was the gunman who robbed the UDF.

**{¶51}** The State must prove a perpetrator's identity beyond a reasonable doubt. *State v. Jackson*, 2017-Ohio-635, ¶ 7 (9th Dist.). It may prove identity through direct or circumstantial evidence. *See State v. Tate*, 2014-Ohio-3667, ¶ 19 ("A witness need not physically point out the defendant in the courtroom as long as there is sufficient direct or circumstantial evidence proving that the defendant was the perpetrator."). Circumstantial identity evidence may consist of matching clothing and unique physical attributes. *See State v. Spomer,* 2023-Ohio-1312, ¶ 28 (5th Dist.).

**{¶52}** D.K. testified that he viewed surveillance stills from the UDF robbery and identified the perpetrator's hat as unquestionably his hat that had been in his truck. D.K. also testified that the robber was wearing his "employee-issued" blue Pepsi sweater and had his gun, which had uncommon identifying features. D.K. saw Saleem driving his stolen truck. The State produced a bodycam still from Saleem's arrest showing Saleem with a cast on his left hand. That cast matched the cast worn by the perpetrator in the UDF and Nordstrom Rack surveillance footage. Saleem admitted to

the attempted theft at Nordstrom Rack. The evidence was sufficient to support Saleem's aggravated-robbery conviction.

{¶53}  Saleem, however, argues that the evidence does not credibly prove that he robbed the UDF. He begins by emphasizing the lack of DNA evidence connecting him to the scene. Officers recovered a candy bar wrapper held by the gunman at the UDF and tested it for DNA. But the "profile contain[ed] insufficient data to produce an interpretable STR typing result," and it could not "be used for comparison with Rashad Saleem." Accordingly, DNA testing was inconclusive—it neither established nor excluded Saleem as a contributor of the DNA on the candy bar wrapper.

{¶54}  Next, Saleem argues that D.K. did not see a cast when he was robbed at gunpoint and the UDF manager did not identify him as the robber. But D.K. was robbed at roughly 3:30 a.m., "it was so dark that [D.K.] couldn't tell" if the gunman was wearing a cast, and D.K. was "not looking for that." And the UDF assistant manager testified that he was shocked, surprised, and had "all kinds of emotions" going through his head when he saw the gun. He "just kept staring at the gun."

{¶55}  Saleem's conviction is supported by sufficient evidence and consistent with the weight of the evidence. We overrule his second assignment of error.

### III.   Conclusion

{¶56}  We overrule Saleem's assignments of error and affirm his convictions.

Judgment affirmed.

ZAYAS and BERGERON, JJ., concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.